NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0540n.06

No. 13-4352

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 22, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIAM BUSH, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF OHIO, |
| WARDEN, SOUTHERN OHIO | ) | WESTERN DIVISION |
| CORRECTIONAL FACILITY, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before: WHITE, DONALD, and O'MALLEY[*], Circuit Judges.

O'MALLEY, Circuit Judge. William Bush, a prisoner in state custody at the Southern

Ohio Correctional Facility in Lucasville, Ohio, appeals the district court's denial of his petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (2012). Although Bush requested

argument, this panel unanimously agrees that oral argument is not necessary. Fed. R. App. P.

34(a). For the following reasons, we **AFFIRM** the district court's judgment.

I

On May 30, 2008, in Cincinnati, Ohio, Robert Walls died from a fatal gunshot wound to

the neck while fleeing after stabbing Bush in the shoulder during an illegal drug transaction.[1]

_____

[*] The Honorable Kathleen M. O'Malley, Circuit Judge for the United States Court of
Appeals for the Federal Circuit, sitting by designation.

[1] Under 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to the judgment of a State court, a determination
of a factual issue made by a State court shall be presumed to be correct. The applicant shall have
the burden of rebutting the presumption of correctness by clear and convincing evidence." Bush

*State v. Bush*, No. C-090291, 2010 WL 2543910, at *1 (Ct. App. Ohio June 25, 2010). During the ensuing investigation, the police identified Bush as a potential suspect and took him into custody on July 18, 2008. *Bush v. Warden*, No. 1:11-cv-914, 2012 WL 6676426, at *1 (S.D. Ohio Dec. 12, 2012) ("Magistrate Report & Recommendation"). Officer Hilbert and Detective Grant conducted a forty minute interview with Bush at the police station. At the start of the interview, the officers established that Bush could read and write, was not intoxicated at the time of the interview, and could answer questions coherently. Officer Hilbert then read Bush his *Miranda* rights off of a Notification of Rights form, while Bush followed along reading the form. Hilbert asked Bush if he had any questions. Bush indicated he did not and signed the form.

During the interview, and before Bush requested counsel, Bush admitted that he was present at the scene of the shooting and had been stabbed by Walls, but denied shooting Walls. Upon further questioning, the interviewers and Bush engaged in the following exchange, where Bush requested an attorney on three separate occasions and admitted to shooting Walls:

> INTERVIEWER: … William, there is no doubt in our mind that you shot the guy.
> BUSH: *Can I get a lawyer, my man?* I ain't trying to fuck you all or nothing, but I know from the streets, bro, that with a public [pretender][2] I'm going to straight 25 or something. You feel me?
> INTERVIEWER: Um-hmm. You got a lawyer in mind?
> BUSH: I don't bro. . . .
> BUSH: What am I looking at? Be real with me. What am I looking at?
> INTERVIEWER: You're looking at anywhere from an aggravated murder or you're looking at a manslaughter. You're looking at a life tail or non-life tail. We can't—William, what I'm trying to tell you, man—
> BUSH: I catch you. I'm just—trying to give me a couple of seconds. Give me a couple of seconds. But you already know. I ain't about to lie to you all man. Dude stabbed me. I don't even have no gun on me and I don't even know where the gun at. Like I don't even know where the gun at, but you already known what

---

has not attempted to present clear and convincing evidence to rebut any of the Ohio Court of Appeals's factual findings, so the district court correctly presumed that those findings are correct. *Id.*

[2] While the transcript in the record shows that Bush said "public defender," Bush actually says "public pretender" in the recorded interview.

you all know. *So, I mean, I just want a lawyer, bro, because I ain't trying to fuck myself.* I ain't trying to make you drive hard or nothing, but he tried to kill me dog. Like, you feel me? This is me standing at the wrong place at the wrong time. . . .
INTERVIEWER: All right, I can't really ask you any more questions, but I'm not going to stop you from talking.
BUSH: Right.
INTERVIEWER: You know what I'm saying? Well, at this point—[3]
BUSH: Hold on. Let me ask you another question, my man.
INTERVIEWER: Um-hmm.
BUSH: If I don't like—would it look better for me if I just go ahead and just tell you all? I mean, would it be better for me?
INTERVIEWER: You want my personal opinion?
BUSH: Yeah, truthfully.
INTERVIEWER: The truth is always going to be better. That's my personal opinion.
BUSH: Man, they told me—I mean, I already know its not better not to tell you all, but I can't do 25 when dude tried to kill me. I don't know what happened, bro. I just know that I was standing right there when the bad deal was going down and the mother fucker stabbed me. I didn't have nothing to do with it. *I shot him, but I didn't try to shoot him.* The gun wasn't even mine. . . .
INTERVIEWER: You say you shot him with somebody else's gun?
BUSH: Yeah, I don't even know who. It was like somebody brought their gun over my baby's momma house. Somebody that I knew. *I mean, if I got to say the names or that shit, I just take my lawyer right now.*
INTERVIEWER: No, I'm just asking.
BUSH: Somebody left a gun at my house and they asked me to bring it back to them.

*Magistrate Report & Recommendation*, 2012 WL 6676426 at *12-14 (emphasis added). The interviewers then asked more questions about the gun, but not about to whom it belonged or from where Bush got it, which Bush answered. The exchange continued:

BUSH: It was me. You already know it was me. I ain't about the bullshit. You already know what manslaughter could carry. I want to know from you, 8 to 10, 15 to 20?
INTERVIEWER: It carries anywhere from 3 to 13.
INTERVIEWER: You want to know what manslaughter carries?
INTERVIEWER: But here's why I'm in a little precarious position. I'm not forcing you to give this statement.

---

[3] Officer Hilbert testified that, at this point in the interview, he attempted to reach over and turn off the tape recorder. *Magistrate Report & Recommendation*, 2012 WL 6676426, at *14.

> BUSH: But I want you all to know bro. It ain't like – bro, I'm sorry this man like gone. I really am though. But I'm even more sorry that he pulled the knife on me and now my life fucked up . . . .

The interviewers continued to question Bush about what happened during the shooting, and Bush answered their questions. The interviewers later asked Bush about what he did with the weapon, and Bush requested an attorney for a fourth time:

> INTERVIEWER: I know you won't give us any names, but you could tell what you did with [the gun]?
> BUSH: I honestly don't remember. I mean, *I just want a lawyer before I say on that because I give you all enough information for you all to know.*
> INTERVIEWER: Okay. I have to stop because you requested a lawyer.
> BUSH: I mean, does it look bad for me, my man? Just be real, man.

July 18, 2008 Interview Tr. at 47-48, *attached as* Doc. 10, Ex. 18, *Magistrate Report & Recommendation* (emphasis added). The interview continued, with Bush confessing:

> BUSH: . . . I wasn't going to tell you all nothing, my man. But it's just like, my God, telling me not to be on that.
> INTERVIEWER: Let me get this straight. I know. I want to make sure it's a voluntary statement that you gave me up to here, okay, because you did mention an attorney a couple of times and that's fine, no problem.
> BUSH: *I don't feel like it's voluntary.* I feel, like, you already knew what shit it was and I didn't want you all to think, like, I just tried to kill a man and everybody saying it was me, brother.

*Id.* at 49 (emphasis added). Before concluding the interview, Officer Hilbert and Detective Grant again attempted to clarify that Bush's statements were voluntary:

> INTERVIEWER: Back to the question we asked you before. You requested a lawyer but you continue to talk at your own free will.
> BUSH: I mean, yea, brother. Because I feel you all was going to railroad me.

*Id.* at 51. A Hamilton County, Ohio, grand jury returned an indictment charging Bush with one count of murder with firearm specifications.

4

II

Bush's trial counsel filed a motion to suppress any statements Bush made while in custody, arguing that the officers continued to question Bush after he invoked his right to counsel and that Bush was on drugs at the time officers interviewed him, but the trial court denied the motion on the record at the end of an October 17, 2008 hearing. At trial, the prosecution played the July 18, 2008 taped interview for the jury and entered it into evidence. The jury found Bush guilty of murder with the firearm specification, and the trial court sentenced Bush to eighteen years to life─fifteen years to life for murder and three years on the merged firearm specification.

Bush appealed to the Ohio Court of Appeals, First Appellate Division, *State v. Bush,* No. C-090291, 2010 WL 2543910 (Ct. App. Ohio June 25, 2010), claiming his waiver of rights was involuntary because he was under the influence of drugs and that he was improperly denied counsel when he requested one. The Ohio Court of Appeals concluded that the police properly advised Bush of his rights and Bush knowingly and voluntarily waived those rights because there was no indication that Bush was intoxicated at the time of the interview, the interviewers read the Notification Form to Bush, and Bush signed the Notification Form. The Ohio Court of Appeals further held:

> [T]he police did not improperly continue the interrogation despite Bush's repeated requests for counsel. Even though Bush requested the assistance of counsel several times during the interview, each time he further initiated the interrogation by continuously speaking to interrogators, or by conditioning his request for counsel. On at least two occasions, the police attempted to stop the interview with Bush, only to have Bush interrupt them by asking questions of his own regarding the investigation.

*Id.* at *2. The Ohio Court of Appeals overruled all of Bush's assignments of error and affirmed the conviction. The Ohio Supreme Court declined jurisdiction to hear the case, dismissing the

appeal for want of a substantial constitutional question. *State v. Bush*, 126 Ohio St. 3d 1587, 1587 (2010).

Bush filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio on December 27, 2011. Bush claimed two grounds for relief: (1) the trial court's failure to grant his motion to suppress; and (2) prosecutorial misconduct.[4] The district court assigned the petition to Magistrate Judge Bowman for a Report and Recommendation, and later adopted the Magistrate Judge's Report and Recommendation in its entirety. With respect to his motion to suppress, Bush challenged the Ohio Court of Appeals' determinations that his initial waiver was voluntary, and that the officers did not violate the Fifth Amendment by continuing to interrogate him after he requested counsel. As to the voluntariness of his initial waiver, the Magistrate Judge found the following facts identified by the Ohio Court of Appeals to be highly relevant: Bush admitted he could read and write; Bush did not appear to the officers to be intoxicated; Bush was read the Notification of Rights Form; Bush failed to ask any questions about his rights when provided with the opportunity; and Bush signed the Notification Form. Under a "totality of circumstances" analysis, the Magistrate Judge agreed with the Ohio Court of Appeals that Bush knowingly and voluntarily waived his *Miranda* rights at the start of the interview regardless of any possible drug use earlier in the day.

The Magistrate Judge concluded that Bush's claim that he was denied counsel upon request presented a "closer question." *Magistrate Report & Recommendation*, 2012 WL 6676426, at *12. The Magistrate Judge was "not particularly concerned" with the latter two of Bush's requests for counsel, concluding that the law enforcement officers did not further pursue the line of questioning they were on once Bush asserted the conditional requests for counsel, and

---

[4] The prosecutorial misconduct charge is not at issue in the present appeal.

that Bush continued to talk to the interviewers even after they attempted to stop the interview. *Id.* at *15.

The Magistrate Judge, however, found the first two requests for counsel troubling because the Ohio Court of Appeals failed to "make any finding" regarding whether the totality of circumstances demonstrated a "knowing waiver of the right to counsel" when Bush initiated further conversation with the interviewers after requesting counsel. *Id.* Rather than determining whether the Ohio Court of Appeals' decision was contrary to or an unreasonable application of *Edwards v. Arizona*, 451 U.S. 477 (1981), sufficient to meet the requirements of § 2254(d), the Magistrate Judge assumed, without deciding, that it was, but found the error harmless. Bush's admissions during the interview prior to requesting counsel, lack of a full confession prior to requesting counsel, and witness testimony at trial identifying Bush as the shooter constituted "substantial, overwhelming evidence establishing petitioner's identity as the shooter and his guilt on the murder charge" to the Magistrate Judge, such that it was harmless error for the trial court to enter Bush's admissions during the interview into evidence. *Magistrate Report & Recommendation*, 2012 WL 6676426, at *19. Consistent with her expressed concerns, however, the Magistrate Judge recommended that a certificate of appealability issue regarding Bush's statements made after requesting counsel.

In adopting the Magistrate Judge's Report and Recommendation in full, the district court denied Bush's petition for a writ of habeas corpus, and issued a limited certificate of appealability:

> A certificate of appealability shall issue only with respect to Petitioner's claim in Ground One of the petition that his statements to the police after he invoked his right to counsel were obtained in violation of the Fifth Amendment, and therefore, should not have been admitted into evidence at trial.

7

*Bush v. Warden*, No. 1:11-cv-914, 2013 WL 5656195 at *5 (S.D. Ohio Oct. 16, 2013). The district court had jurisdiction over Bush's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court has jurisdiction over Bush's appeal pursuant to 28 U.S.C. § 1291.

III

In an appeal from a petition for a writ of habeas corpus, we review the district court's legal conclusions de novo and factual findings for clear error. *Awkal v. Mitchell*, 613 F.3d 629, 638 (6th Cir. 2010) (en banc). Bush filed his petition under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) imposes the following standards on a federal court hearing a petition for a writ of habeas corpus on behalf of a person in state custody:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Thus, under § 2254(d), we may not, in considering a petition for a writ of habeas corpus, upset a state court judgment adjudicated on the merits unless we find that the judgment meets one of the exceptions in § 2254(d)(1) or § 2254(d)(2). A state court judgment meets the "contrary to" exception in § 2254(d)(1) if: (a) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases;" or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362,

405-06 (2000). A state court judgment meets the "unreasonable application" exception in § 2254(d)(1) if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. In determining if there is an "unreasonable application," we must "ask whether the state court's application of clearly established federal law was objectively unreasonable."[5] *Id.* at 409. Thus, we "may not issue the writ simply because [the federal] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Clear error will not suffice to meet the "objectively unreasonable" standard. *White v. Woodall*, 572 U.S. —, 134 S. Ct. 1697, 1702 (2014) (citing *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)).

"[I]n a habeas proceeding[,] the petitioner has the burden of establishing his right to federal habeas relief." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (en banc) (internal quotation marks omitted). Under § 2254(d), we only have authority "to issue the writ in cases where there is no possibility that fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786 (2011). "The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." *White*, 134 S. Ct. at 1706-07 (internal quotation marks omitted). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the

---

[5] "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted).

benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington,* 131 S. Ct. at 786 (internal quotation marks omitted). Thus, Bush must demonstrate that the Ohio Court of Appeals' rejection of his claims for relief "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

IV

The district court's certificate of appealability is limited to the question of whether Bush's "statements to the police after he invoked his right to counsel were obtained in violation of the Fifth Amendment." *Bush v. Warden*, 2013 WL 5656195, at *5. Thus, to determine if the district court correctly denied Bush's petition for a writ of habeas corpus under the standards established by AEDPA, we must review the Supreme Court's jurisprudence on an accused's right to counsel. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the prohibition against self-incrimination in the Fifth and Fourteenth Amendments required that suspects undergoing custodial interrogation[6] be informed of their right to remain silent and their right to have an attorney present during questioning. *Id.* at 479. In *Miranda*, the Court also recognized that, after the police informed the accused of his or her rights, police questioning should cease if the accused invokes his or her right to remain silent or requests an attorney. *Id.* at 474.

---

[6] The Supreme Court later defined a custodial interrogation as "words or action on the part of the police … that the police should know are reasonably likely to elicit an incriminating response form the suspect" while the suspect is in custody. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

10

A suspect can waive his or her *Miranda* rights, but the waiver must be voluntary, knowing, and intelligent. *Edwards*, 451 U.S. at 483. Waiver "depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). In *North Carolina v. Butler*, 441 U.S. 369 (1979), the Court further clarified that, while an "express written or oral statement of waiver" of *Miranda* rights is "strong proof of validity of that waiver," it is not a necessary predicate for waiver—the issue of waiver is "not one of form," but requires a totality-of-the-circumstances analysis. *Id.* at 373-74; *see also Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."). Thus, waiver can be "inferred from the actions and words of the person interrogated." *Butler*, 441 U.S. at 373-74. The *Edwards* Court explained that waiver of a *Miranda* right involves two separate considerations: (1) was a given admission voluntary; and (2) was there a "knowing and intelligent" waiver? *Edwards*, 451 U.S. at 484 (stating that these are "discrete inquiries"); *see also Berghuis*, 560 U.S. at 382-83 ("The waiver inquiry has two distinct dimensions. . ." (internal quotation marks omitted)). A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382. There is a "knowing and intelligent" waiver if the waiver is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382-83.

The Supreme Court further elucidated an accused's right to have an attorney present during an interrogation in *Edwards*. The *Edwards* Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right

cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* Thus, once an accused invokes his right to have counsel present, even if he or she previously waived that right, further interrogation by authorities must cease "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. If an accused initiates conversation, however, nothing prohibits the police from "merely listening to his voluntary, volunteered statements and using them against him at trial." *Id* at 485.

The Supreme Court has explained that *Edwards* created a "prophylactic rule[] designed to protect an accused in police custody from being badgered by police officers." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). In *Bradshaw*, the Court clarified that, even if the accused reinitiates conversation with police after invoking his or her right to counsel, the burden remains on the prosecution to demonstrate that the reinitiation events constituted a knowing and intelligent waiver under a totality of circumstances. *Bradshaw*, 462 U.S. at 1044-45 (plurality opinion) (citing *Edwards*, 451 U.S. at 486 n.9).[7] Thus, under *Bradshaw*, the prosecution must show both that the accused reinitiated the conversation and that the totality of circumstances demonstrates a knowing and intelligent waiver. *Id.* at 1045. The plurality held that inquiries demonstrating a "willingness and a desire for a generalized discussion about the investigation" are sufficient to evidence reinitiation on the part of the suspect. *Id.* at 1045-46; *accord id.* at 1055 (Marshall, J., dissenting) (inquiries that demonstrate "a desire to discuss the subject matter of the criminal investigation" evince initiation). The Court also described certain factual

---

[7]This holding was joined by a majority of the Court. *See Bradshaw*, 462 U.S. at 1048 (Powell, J., concurring) (noting that the plurality and the dissenting justices "agree in one respect. They view the 'initiation' question as the first step of a two-step analysis, the second step being the application of the *Zerbst* standard that requires examination of the 'totality of the circumstances.'") (citing *Johnston v. Zerbst,* 304 U.S. 458, 464 (1938)).

considerations—such as the police making "no threats, promises or inducements to talk, [the] defendant was properly advised of his rights and understood them[,] and that within a short time after requesting an attorney he changed his mind without any impropriety on the part of the police"—as relevant for demonstrating a knowing and intelligent waiver. *Id.* at 1046.

The Court in *Davis v. United States*, 512 U.S. 452 (1994), clarified what a suspect must do to actually invoke his right to have counsel present at an interrogation. The *Davis* Court established an "objective inquiry"—the suspect "must unambiguously request counsel." *Id.* at 459. Importantly, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*

V

Under AEDPA, we analyze the state court's—here the Ohio Court of Appeals'—reasoned decisionmaking to determine if the judgment meets one of the exceptions listed in § 2254(d)(1), (2) that would permit granting of a writ of habeas corpus.

Bush argues on appeal that the police interrogation must be analyzed under a totality of the circumstances approach. Thus, even though his initial *Miranda* waiver is not on appeal, Bush argues that certain facts, such as potentially being under the influence of marijuana at the time of questioning and his purported lack of understanding of his rights during the interview, must be considered in our analysis. While we agree with Bush that these are all factors to be taken into consideration in our analysis, we nonetheless find insufficient grounds upon which to grant the petition.

A

We agree with the Magistrate Judge and the district court that the Ohio Court of Appeals decision does not fall under the "contrary to" exception in § 2254(d)(1). The Ohio Court of Appeals neither applied a rule that contradicts the governing law set forth by the Supreme Court, nor did the court confront a materially indistinguishable set of facts from a Supreme Court decision and arrive at a different result. The Ohio Court of Appeals correctly recognized the appropriate Supreme Court precedent, such as *Miranda*, *Edwards*, *Bradshaw*, and *Davis*, and the facts of this case are not materially indistinguishable from any of those Supreme Court precedents. *Bush*, 2010 WL 2543910, at *2. Thus, we may only grant Bush's petition if we find that the Ohio Court of Appeals' decision meets the "unreasonable application" exception to § 2254(d)(1). We do not. We find that the Ohio Court of Appeals' application of the Supreme Court precedent discussed *infra* was not "objectively unreasonable" under governing Supreme Court precedent. *Williams*, 529 U.S. at 409.

Bush expressed a desire for counsel four separate times during the course of the interview. As an initial matter, we agree with the Magistrate Judge that the final two requests for counsel do not raise constitutional concerns sufficient to grant the writ of habeas corpus. *Magistrate Report & Recommendation*, 2012 WL 6676426, at *15. On both of these later occasions, the interviewers asked Bush to reveal who else was involved in the shooting, either explaining whose gun he used in the shooting or who disposed of the gun. And on both occasions, Bush gave a qualified request for an attorney—stating that he would require an attorney before he revealed what other parties were involved. In response, the police, both times, changed their line of questioning. As the Magistrate Judge recognized, these were conditional requests for an attorney, which the Supreme Court has previously held do not rise to the level of

14

triggering the protections of *Edwards*. *Davis*, 512 U.S. at 459. Also, after the fourth time that Bush invoked counsel, the interviewers attempted to stop the discussion but Bush reinitiated the conversation, despite the officers' attempts. Because the officers honored Bush's clear intention not to discuss certain matters without the presence of an attorney, their continued interrogation of Bush about other matters did not violate his Fifth Amendment rights. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (A broad "[i]nterpretation [of a defendant's request for counsel] is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous. Here, however, Barrett made clear his intentions, and they were honored by police."). Thus, the police did not violate Bush's constitutional rights in either of those two situations.

The Magistrate Judge found that, for Bush's first two references to counsel, the "question . . . is close." *Magistrate Report & Recommendation*, 2012 WL 6676426, at *15. While we agree that the issue is closer for these two instances as compared to Bush's final two requests for counsel, we do not agree it is so close as to prevent the conclusion that the state court decision was reasonable for purposes of federal habeas review. The Ohio Court of Appeals made several key observations regarding Bush's first two requests for counsel: (1) each time Bush requested counsel, *he* reinitiated the interview by continuing to speak with the interviewers; (2) the officers twice "attempted to stop the interview with Bush, only to have Bush interrupt them by asking questions of his own regarding the investigation"; and (3) Bush knowingly and voluntarily waived his *Miranda* rights. *State v. Bush*, 2010 WL 2543910, at *2. Because the Magistrate Judge felt that the Ohio Court of Appeals' analysis was insufficiently clear under AEDPA to deny Bush's petition on those grounds, neither the Magistrate Judge nor the district court made any explicit findings regarding the reasonableness of the state court's factual findings.

*Magistrate Report & Recommendation*, 2012 WL 6676426, at \*15. The Magistrate Judge did conclude, however, that the totality of circumstances did not clearly demonstrate a knowing waiver, since, when Bush first requested counsel, neither interviewer stopped the interrogation and one interviewer explicitly stated that, while they could not ask further questions, they would not stop Bush from speaking. *Id.*

We disagree with the lower court's hesitation. AEDPA imposes an exacting standard for habeas review that we find Bush fails to meet. We agree with the Magistrate Judge that, on direct review, whether Bush's right to counsel was violated would present a "close call." Under AEDPA, however, Bush has failed to show that the Ohio Court of Appeals decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87. Without question, Bush's first two requests for counsel triggered the protection of *Edwards*—the interviewers had to halt the custodial interrogation until an attorney was present. But, as the Ohio Court of Appeals recognized, Bush continued discussion with the interviewers on his own initiative—the "accused himself initiate[d] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. This is not indicative of the circumstance which the prophylactic rule in *Edwards* was designed to prevent—the interviewers here were not "badgering" Bush to waive his invocation of right to counsel in any way. *Bradshaw,* 462 U.S. at 1044. Thus, the police were free to listen to Bush's "voluntary, volunteered statements." *Edwards,* 451 U.S. at 485.

Although the Ohio Court of Appeals did not specifically analyze whether there was a knowing and intelligent waiver under *Bradshaw* for each reinitiation event, *see Bradshaw*, 462 U.S. at 1046, that consideration is not dispositive. A state court decision does not have to

provide detailed justifications in order for a federal court to be required to defer to that decision under § 2254(d). *Harrington*, 131 S. Ct. at 784-85 (holding that compliance with § 2254(d) is not excused even when a state court issues a summary ruling). Review of a state court decision under § 2254(d) requires a federal habeas court to determine "what arguments or theories supported or . . . *could have supported* [] the state court decision. . . ." *Id.* at 786 (emphasis added). Thus, a lack of explicit analysis by the Ohio Court of Appeals regarding the knowing and intelligent waiver requirement in *Bradshaw* does not undermine our conclusion under § 2254(d).

We hold that the Ohio Court of Appeals' finding that Bush knowingly and intelligently waived his right to counsel when he continuously reinitiated conversation with the officers was not objectively unreasonable. As the Ohio Court of Appeals recognized, Bush had the Notification of Rights form read to him by his interviewers. He had no questions regarding the form, admitted that he knew how to read, and signed the form. He also admitted that he was not intoxicated, and both the Ohio Court of Appeals and the Magistrate Judge found that Bush sounded coherent during the interview. The interviewers twice reminded Bush that they could not ask him any more questions once he invoked his right to counsel, and each time, Bush, nevertheless, continued to ask questions of the interviewers. These factors are similar to those the Supreme Court identified as relevant in *Bradshaw*, including that the accused was properly advised of his rights and changed his mind about speaking to the police within a short time after invoking his rights. *Bradshaw,* 462 U.S. at 1045-46. While Bush later stated in the interview that he did not believe the admissions were "voluntary," this was not due to any sort of "threats, promises or inducements" by the police, *id.* at 1046, but because Bush felt that the police had a very strong case against him and that he, thus, wanted to explain that the shooting was

accidental. *See Magistrate Report & Recommendation*, 2012 WL 6676426, at *14 ("I don't feel like its voluntary. I feel, like, you already knew what shit it was and I didn't you all to think, like, I just tried to kill a man and everybody saying it was me, brother.").

The totality of circumstances demonstrate that the Ohio Court of Appeals was not objectively unreasonable in finding that Bush reinitiated conversation with his interviewers after each invocation of his right to counsel under *Edwards*, and knowingly and intelligently waived his *Miranda* rights after requesting counsel. Under the Supreme Court's decisions in *Edwards*, *Butler*, *Bradshaw*, and *Davis*, we cannot say that the Ohio Court of Appeals' rejection of Bush's claims for relief "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 131 S. Ct. at 786-87. We thus affirm the district court's denial of Bush's petition for a writ of habeas corpus.

B

We affirm the district court's denial of Bush's petition for a writ of habeas corpus because we find that, under AEDPA, the Ohio Court of Appeals was not objectively unreasonable in determining that Bush knowingly and voluntarily waived his right to counsel before the interview began, and then reinitiated the interview with the officers after invoking his right to counsel, such that the officers did not violate Bush's *Edwards* rights. Even if there were a constitutional violation sufficient to meet the "unreasonable application" exception in § 2254(d)(1), however, we agree with the district court that any such error was harmless. In habeas review, even if a federal court finds an error sufficient to meet one of the exceptions in § 2254(d), a petitioner is not entitled to relief unless the purported error, "viewed in context of the entire record, had a substantial and injurious effect or influence in determining the jury's

verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 638 (1993); *see, e.g.*, *Moore v. Berghuis*, 700 F.3d 882, 889 (6th Cir. 2012) *cert. denied*, 133 S. Ct. 2340 (2013) (applying *Brecht*'s harmless-error standard to review of state court's erroneous admission of petitioner's custodial statement). We agree with the district court that the prosecution's evidence strongly supports Bush's conviction, even without the admissions Bush made after he invoked his right to counsel. Prior to requesting counsel, Bush admitted during the interview that he was present at the scene and was stabbed by a "white dude" who "could have been" the victim. After Bush admitted to the shooting, he explained that the shooting was either accidental or in self-defense. Thus, while Bush did admit to shooting Walls, this was not a "full confession" that would presumptively prejudice the jury. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). The prosecution also presented two witnesses who identified Bush as the shooter. *Magistrate Report & Recommendation*, 2012 WL 6676426, at \*17-18. Donovan Clark, an eyewitness, testified that he saw Bush and the victim talking, and heard Bush cry out, "he cut me," and "I'm going to kill this motherfucker." He then saw Bush chasing the victim, heard shots fired, and saw a gun in Bush's hand. He knew it was Bush who fired the shots because "it was the only gun there." Shontay Smith, a friend of Bush's who reluctantly testified for the prosecution, testified that on the day of the shooting, Bush came to her house and told her that he had shot a man who had stabbed him. *Id.* at \*18. Smith stated that Bush brought a bag of clothes with him that he burned on the grill in her backyard. *Id.* Officers later recovered clothing remnants from the grill that were introduced into evidence. Other witnesses present at the scene corroborated Clark's testimony that two or three shots were fired, and that the victim had approached Bush looking to buy drugs. We agree with the district court that Bush's own statements prior to invoking his right to counsel, in combination with the witness testimony, constitutes "substantial, overwhelming evidence

establishing petitioner's identity as the shooter and his guilt on the murder charge." *Id.* at *19.

Even if we had not concluded that the Ohio Court of Appeals' decision was not objectively

unreasonable, Bush's petition for a writ of habeas corpus would be denied for harmless error.

VI

For the foregoing reasons, we **AFFIRM** the district court's denial of Bush's habeas petition.