NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0153n.06

Case No. 23-3265

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 04, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| WILLIAM SIDNEY HITCHINGS, V, | ) ) | |
| Defendant-Appellant. | ) ) | OPINION |

Before: GRIFFIN, NALBANDIAN, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** William Hitchings pleaded guilty to receipt of child pornography. He now appeals the district court's denial of his motion to suppress statements he made during a February 2021 interrogation by law enforcement officers. Hitchings argues that the district court erred in denying his motion to suppress because the officers violated his Fifth Amendment rights during the interrogation. For the reasons explained below, we affirm.

**I.**

Law enforcement obtained a warrant to search Hitchings's home after suspecting him of sending and receiving child pornography. In February 2021, the FBI, with the help of local police in Troy and Dayton, Ohio, executed the warrant during the early morning hours. Officers observed Hitchings leave through his home's back door as they approached, and they apprehended him as he attempted to flee from the house. The officers handcuffed Hitchings, who was not wearing shoes, and placed him in the back seat of an unmarked police vehicle. Task Force Officer Jeffrey

Kunkleman of the Troy Police Department ("TPD") and Special Agent Andrea Kinzig of the FBI then transported Hitchings to the TPD's police station to question him.

Kunkleman and Kinzig escorted the still handcuffed and shoeless Hitchings into an interview room around 6:27 a.m. The interviewing officers left Hitchings alone in this room with the door closed. Around 6:32 a.m., the interviewing officers re-entered the room, removed Hitchings's handcuffs, and provided him with a bottle of water. Then, they told him he was not under arrest, that he was free to leave at any time, and that they brought him in just to talk.

Kinzig established several things during the initial stages of Hitchings's interview and before she advised him of his *Miranda* rights. She asked Hitchings if he was currently under the influence of any drugs. Hitchings told her that he had smoked both marijuana and methamphetamine just before officers arrived at his home that morning. When Kinzig inquired about his ability to think clearly and understand her questions following his drug use, Hitchings unequivocally stated that he was "fully cognizant," he had no trouble understanding what was going on, and that he was "so here right now it's not even funny." Kinzig also established that Hitchings spoke English, could read and write, and had received a high school diploma with vocational training in computer networking. Kinzig explained to Hitchings that she typically advises interviewees of their *Miranda* rights before she asks any questions. Before she read Hitchings his *Miranda* rights, however, he stated that he was not waiving his rights but that he understood them. Kinzig then read Hitchings his rights. After that, Hitchings signed a form confirming his understanding of those rights and confirming that he would answer questions without an attorney present.

2

After being read his rights, Hitchings answered most, but not all, of the interviewing officers' questions. He answered Kinzig's questions about his upbringing, education, and work history. He also answered her questions about his past drug addictions and completion of drug rehabilitation programs. He provided Kinzig with his email addresses and his phone number. Still, Hitchings would not answer Kinzig's questions about the email address and phone number he used to sign into his Facebook account, the password to his computer server, or where officers could locate the footage from his home's surveillance cameras.

Early in the interview, Hitchings oscillated between calmly answering questions and extreme frustration. For example, he expressed frustration with what he viewed as pointless questions and inquired what purpose the interviewing officers had behind their inquiries. Still, at other times, he asked for a moment to compose himself so that he could continue answering the interviewing officers' questions. When he made such a request, the interviewing officers allowed him the time he needed to calm down, encouraged him to drink water, and offered him a snack.

About an hour into the interview, Kinzig asked Hitchings if he had any idea why she and Kunkleman wanted to speak with him. Hitchings did, and this conversation ensued:

| | |
|---|---|
| Kinzig: | Okay, well, do, can you share with me what your thought is? |
| Hitchings: | Certain content, certain data. Is that what it is about? |
| Kinzig: | It is. |
| Hitchings: | Okay, then yeah, it's me. |
| Kinzig: | What, now what data are we talking about? |
| Hitchings: | Um, illegal content. |
| Kinzig: | And what kind? |
| Hitchings: | Underage and uh, probably bestiality. |
| Kinzig: | Are we talking about pornography? |
| Hitchings: | Uh huh. And that is the only thing that I have, that's, that's it. |

3

| Kinzig: | Okay, so when we are talking about underage pornography, um, what devices are those on? Because we really don't want to take all of the computers in the house. |
| Hitchings: | I understand. It's um, (*bangs head on the table*). |
| Kinzig: | Let's not do that. Let's not do that William. |
| Kinzig: | Is it on your laptop or your phone or on the server? Because again, we don't want to take that server if we don't have to. |
| Hitchings: | Lawyer. I have to have a lawyer from this point on. Don't I? |
| Kinzig: | It's up to you. |
| Hitchings: | I want to help you, but it doesn't matter. I'm already dead anyway, so it doesn't fucking matter. I'm not answering questions anymore until you find me an attorney. Please find me an attorney. |

At this point, Hitchings put his head down on the table in front of him. Kinzig responded by saying "okay," put away her pen, and closed the notebook she was using to document the interview. Seconds later, Hitchings asked the officers if he was supposed to request an attorney, and they explained that it was his choice. Hitchings then asked for the officers' "honest[]" opinions on whether he should request an attorney, and Kunkleman responded that, in his opinion, "it's always better to cooperate."

A few moments later, Hitchings began punching himself in the head; Kinzig and Kunkleman then handcuffed him. As they did so, Hitchings and Kunkleman argued about Hitchings's behavior.

Meanwhile, Kinzig finished handcuffing Hitchings, packed up her belongings, and left the room. Kunkleman did not follow her out of the interview room. Instead, he continued to argue with Hitchings, pushed the interview table out of Hitchings's reach, and sat on the table to face

Hitchings. Kinzig returned after a few seconds and gestured to Kunkleman to exit the room with her. As she was about to leave the room for a second time, Hitchings said "wait, wait, wait."

Kinzig stopped to hear what Hitchings had to say. He apologized to the officers for his outburst. Hitchings turned to Kinzig and calmly said "Please sit down. I'll tell you . . . I'll tell you whatever you want to know."

While still standing in the doorway, Kinzig explained to Hitchings that if they continued the interview, he would remain handcuffed for his own safety. Hitchings agreed to that condition multiple times. Still, Kinzig indicated that she was not comfortable continuing with the interrogation because Hitchings had requested an attorney; Hitchings nevertheless insisted that he did not need an attorney. For the next few hours, Hitchings made several inculpatory statements, including extensive details about his digital child pornography collection. Several hours into the interview, Kinzig provided Hitchings with a pair of his shoes.

Kunkleman and Kinzig questioned Hitchings for nearly six hours. Once they concluded the interview, Hitchings was arrested.

A federal grand jury indicted Hitchings on several charges. A superseding indictment eventually charged Hitchings with possessing child pornography, possessing a gun while using controlled substances, two counts of receiving child pornography, and transporting child pornography.

Hitchings moved to suppress his inculpatory statements made to the officers during the interrogation. He argued that the interviewing officers obtained those statements from him in violation of his Fifth Amendment rights. The district court held a hearing on Hitchings's suppression motion where Kinzig testified about the interrogation. The government also

5

introduced, and the district court admitted, the video recording of the interview during the suppression hearing.

The district court denied Hitchings's motion, finding: Hitchings was subject to custodial interrogation during the interview; Hitchings voluntarily, knowingly, and intelligently waived his *Miranda* rights; Hitchings made an unequivocal request for counsel, but then he reinitiated the interview and waived his rights again; and Hitchings made his admissions during the interview freely, voluntarily, and without improper influence.

Thereafter, Hitchings pleaded guilty to one count of receiving child pornography pursuant to a plea agreement which preserved his right to appeal the district court's denial of his motion to suppress. After the district court sentenced Hitchings, this appeal timely followed.

## II.

When considering a district court's decision on a motion to suppress evidence, we review findings of fact for clear error and conclusions of law de novo. *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022). "When a district court has denied a motion to suppress," as the district court did here, "we consider the evidence in the light most favorable to the government." *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006) (citation omitted).

## III.

Hitchings contends that he was interrogated in violation of the Fifth Amendment's Self-Incrimination Clause. This clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To make this right meaningful, the Supreme Court has held that, prior to a custodial interrogation, law enforcement officials must inform the individual to be interrogated that: (1) he has the right to remain silent; (2) his statements may be used against him in court; (3) he has a right to an attorney during questioning; and (4) if

he cannot afford an attorney, one will be appointed to represent him. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprised of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda*, 384 U.S. at 478–79). The government bears the burden of proving, by a preponderance of the evidence, that a defendant has made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

**A.**

We first consider whether Hitchings was in custody when Kinzig and Kunkleman interrogated him.[1] An accused must be "in custody" before officers are required to provide *Miranda* warnings and thereafter interrogate the accused. *United States v. Levenderis*, 806 F.3d 390, 400 (6th Cir. 2015). Courts "must examine all of the circumstances surrounding the interrogation" to determine whether "an individual was in custody." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam). This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323. "The ultimate inquiry is whether, under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (citing *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)). We generally consider the following four,

---

[1] The district court found that Hitchings was in custody during the entire interview, yet both parties contend on appeal that Hitchings was not in custody during the initial portion of the interrogation before he was handcuffed. Whether a person was "in custody" during an interrogation is a "mixed question of law and fact" that we review de novo. *United States v. Zabel*, 35 F.4th 493, 501–02 (6th Cir. 2022). The parties do not truly dispute the facts, most of which are captured on video. And "[w]e are not bound to accept what in effect was a stipulation on a question of law." *United States v. Wilson*, 978 F.3d 990, 996 (6th Cir. 2020) (quotation omitted). Therefore, we analyze whether Hitchings was in custody for the entirety of the interrogation.

nonexhaustive factors when making the in-custody determination: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told he or she did not need to answer the questions." *Levenderis*, 806 F.3d at 400 (quoting *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010)). Considering these factors, we agree with the district court that Hitchings was in custody for the entire period of the interrogation.

*Location of the interview.* Kinzig and Kunkleman interrogated Hitchings at the police station after transporting him there in the back of a police car in handcuffs.

*Length and manner of questioning.* The interview lasted approximately six hours. And the questioning resembled a custodial interrogation in almost all respects. Kinzig and Kunkleman read Hitchings his *Miranda* rights at the beginning of the interview and had Hitchings sign a form indicating that he understood and waived those rights. The officers spent most of the interview time questioning Hitchings about subjects related to their child pornography investigation that led to the execution of a search warrant at his residence earlier that day.

*Restraint on freedom of movement.* This factor is tricky under the circumstances in this case. But it generally leans in favor of the district court's finding that Hitchings was in custody for the entirety of the interrogation. As mentioned above, when the officers executed the search warrant at Hitchings's residence, they handcuffed him, transported him to the police station, and placed him in an interview room. A few minutes after Hitchings was placed in the interview room, Kinzig and Kunkleman entered and removed the handcuffs. The door to the interview room remained closed during the interrogation. That said, at the beginning of the interview, the officers advised Hitchings that he was free to leave at any time. But Hitchings did not have his shoes on during his transport to the police station, nor was he wearing shoes when his interview began.

8

In fact, Kinzig did not return with his shoes until approximately four hours into the interview. It is hard to imagine that someone in Hitchings's position would feel free to leave under those circumstances. Additionally, approximately one hour into the interrogation, Kunkleman handcuffed Hitchings after he had an emotional outburst.

*Whether Hitchings was told he did not have to answer questions.* Kinzig and Kunkleman told Hitchings that he did not have to answer questions, so this factor weighs in favor of Hitchings not being in custody. But as we have explained previously, "the existence of such advice is one factor among many." *Panak*, 552 F.3d at 467. What is more, "[i]t would be strange, indeed, to say that a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the *Miranda* warnings—that []he need not answer questions." *Id.*

\*        \*        \*

The first three factors weigh in favor of Hitchings being in custody, while the last one does not. Therefore, the totality of the circumstances reveals that Hitchings was in custody throughout the interrogation by Kinzig and Kunkleman.

**B.**

We next consider whether Hitchings waived his *Miranda* rights during the interrogation. A valid *Miranda* waiver requires an individual to waive his right against self-incrimination voluntarily, knowingly, and intelligently. *See Garner v. Mitchell*, 557 F.3d 257, 260–61 (6th Cir. 2009). Two "dimensions" guide our inquiry into "whether a defendant freely and knowingly chose to talk with police despite *Miranda* protections"—"voluntariness and comprehension." *United States v. Abdalla*, 972 F.3d 838, 852 (6th Cir. 2020) (quoting *Garner*, 557 F.3d at 263). Voluntariness requires "a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Lawrence*, 735 F.3d 385, 437 (6th Cir. 2013) (quoting *Moran v.*

9

*Burbine*, 475 U.S. 412, 421 (1986)). Comprehension requires an accused's "full awareness of both the nature of the right" he chooses to abandon and "the consequences of" his "decision to abandon it." *Id.* (quoting *Moran*, 475 U.S. at 421). Put differently, "[t]he question is not whether [Hitchings] knew and understood every possible consequence of a waiver, but rather whether he knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* (quoting *Garner*, 557 F.3d at 261). An individual validly waives his *Miranda* rights when "the totality of the circumstances surrounding the interrogation" reveals he voluntarily chose to do so while comprehending the nature of that choice. *Moran*, 475 U.S. at 421 (quotation omitted); *Garner*, 557 F.3d at 260–61.

The district court concluded that Hitchings voluntarily, knowingly, and intelligently waived his *Miranda* rights. The evidence showed that officers began interviewing Hitchings approximately 30 minutes after they apprehended him. Before questioning him, Kinzig and Kunkleman removed Hitchings's handcuffs and gave him a bottle of water. Both officers were wearing plain clothes and did not brandish their guns at any time during questioning.

The first ten minutes of the recorded interview are revealing. During that part of the interview, Kinzig, in a calm and conversational tone, established that Hitchings spoke English, could read and write, and had a high school education with vocational training in computer networking. She also asked Hitchings whether he was under the influence of any drugs. Hitchings admitted that he had taken a small amount of marijuana and methamphetamine that morning, but he insisted more than once that he was able to understand what was happening to him. According to Kinzig, who testified that she had experience interacting with people under the influence of such drugs, Hitchings did not seem impaired during the interview despite his drug use. In fact, she testified that "he spoke very intelligently and articulately throughout the interview."

10

After establishing that Hitchings could comprehend what was going on, Kinzig read Hitchings his *Miranda* rights. Hitchings then signed a form that set forth those rights. That form also confirmed that he understood his rights and that he was willing to answer questions without an attorney present. During the next 40 minutes, Hitchings refused to answer several of Kinzig's questions, including questions that could have led to potentially incriminating evidence. He also expressed frustration with what he viewed as irrelevant questions and repeatedly asked the interviewing officers to reveal the real reason they wanted to speak with him.

The district court did not err in finding that Hitchings waived his *Miranda* rights. First, there is no evidence that the interviewing officers intimidated, coerced, or deceived Hitchings into signing the waiver form or into responding to their questions. In fact, Kinzig told Hitchings several times that he did not have to answer their questions. Every time Hitchings asked if he should have an attorney present, the interviewing officers told him that the choice was up to him. The evidence instead suggests that Hitchings freely and deliberately chose to waive his rights—he said he wanted to answer the interviewing officer's questions and explained his desire to help the officers' investigation more than once. What is more, the interviewing officers remained calm throughout the interview, though they reasonably reacted to Hitchings's emotional outburst. Once the officers handcuffed Hitchings following the outburst, however, the questioning resumed its earlier conversational tone.

Second, the evidence suggests Hitchings comprehended his rights. True, Hitchings seemed confused about the interviewing officers' role in informing him whether he might be incriminating himself. For example, he asked: "[H]ow far do I incriminate myself telling you things that are personal? You know, like, before I actually do need one of those attorneys. I, I need to understand it." But a valid waiver does not require Hitchings to understand "every possible consequence" of

11

such a choice. *See Lawrence*, 735 F.3d at 437. A valid waiver instead requires that he understood he could "choose not to talk to law enforcement officers" or "discontinue talking at any time." *Id.* (quotation omitted). Hitchings's refusal to answer some of the interviewing officers' questions while choosing to answer others demonstrates he understood that requirement. A valid waiver also requires that Hitchings understood he could choose to have counsel present. *Id.* The interviewing officers reminded him of this choice every time he asked if he needed an attorney.

Hitchings also argues that Kinzig and Kunkleman should have readvised him of his *Miranda* rights after his emotional outburst when they handcuffed him. This argument fails because we, like the district court, conclude that Hitchings was in custody for the entirety of the interrogation. We require additional *Miranda* warnings only "if the circumstances seriously changed between the initial warnings and the interrogation." *Treesh v. Bagley*, 612 F.3d 424, 432 (6th Cir. 2010) (citing *Wyrick v. Fields*, 459 U.S. 42, 47 (1982)). Courts have, moreover, "generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (quotation omitted).

Kinzig and Kunkleman interrogated Hitchings immediately after advising him of his *Miranda* rights. Thus, the circumstances did not change between the warnings and the interrogation.

## C.

Next, we must decide whether Kinzig and Kunkleman violated Hitchings's Fifth Amendment right to counsel during questioning. Hitchings argues that he invoked his right to counsel during the interrogation, but the officers continued to question him.

An accused subject to custodial interrogation by law enforcement officers has the right to consult with an attorney and to have counsel present during questioning. *Davis v. United States*, 512 U.S. 452, 457 (1994). Law enforcement officers must explain this right to an accused before questioning begins. *Id.* The right to counsel established in *Miranda* was one of a "series of recommended procedural safeguards" that "were not themselves rights protected by the Constitution but were instead measures to insure [sic] that the right against compulsory self-incrimination was protected." *Michigan v. Tucker*, 417 U.S. 433, 443–44 (1974) (quotation omitted).

"The right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations" that the Supreme Court has afforded it "the special protection of the knowing and intelligent waiver standard." *Davis*, 512 U.S. at 458 (quoting *Edwards v. Arizona*, 451 U.S. 477, 483 (1981)). If a suspect validly waives his right to counsel after receiving *Miranda* warnings, law enforcement officers are free to question the suspect, and the suspect is free to respond to questions from the officers. *North Carolina v. Butler*, 441 U.S. 369, 372–76 (1979).

But when a suspect requests an attorney, officers must stop interrogating him. *Fare v. Michael C.*, 442 U.S. 707, 719 (1979) ("[A]n accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease."). In *Edwards*, the Supreme Court explained that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485. So "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484. *Edwards* further held "that an accused . . . having expressed his

13

desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. The *Edwards* rule embodies two independent inquiries:

> First, courts must determine whether the accused actually invoked his right to counsel. . . . Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

*Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam) (citations omitted).

"If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). "This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Id.* (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)). Once a suspect invokes the *Miranda* right to counsel regarding one offense, he may not be re-approached regarding that offense or any other offense unless counsel is present. *Arizona v. Roberson*, 486 U.S. 675, 686–87 (1988). This is a "bright-line rule." *United States v. Potter*, 927 F.3d 446, 450 (6th Cir. 2019).

To benefit from this rule's protection, however, a defendant must clearly invoke his right to counsel. That is, he "must make a 'statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney.'" *United States v. Zakhari*, 85 F.4th 367, 375 (6th Cir. 2023) (quoting *Davis*, 512 U.S. at 459).

14

Here, Hitchings unequivocally invoked his right to counsel when he said: "I'm not answering questions anymore until you find me an attorney. Please find me an attorney." Seconds later—and before the interviewing officers asked him any further questions—Hitchings asked: "That's what I'm supposed to do, right?" The officers replied by telling Hitchings that it was up to him to have an attorney present. And then this exchange happened:

| | |
|---|---|
| Hitchings: | Tell me honestly, like what do you think I . . . (indecipherable). |
| Kunkleman: | Look I'm going to tell you honestly, okay. You want my opinion? |
| Hitchings: | I do. |
| Kunkleman: | I think it's always better to cooperate. I think it goes better in the court system. |

Based on the above exchange, Hitchings immediately reinitiated discussions with the officers after he invoked his right to counsel.

This case is like the underlying circumstances in *Bush v. Warden, Southern Ohio Correctional Facility*, a habeas case where we declined to grant the petitioner relief because the police likely did not violate his Fifth Amendment rights. 573 F. App'x 503, 512–13 (6th Cir. 2014). There, we found that Bush, an accused who earlier invoked his right to counsel, reinitiated questioning and subsequently waived his right when he asked the interviewing officer, unprompted, "would it look better for me if I just go ahead and just tell you all? I mean, would it be better for me?" *Id.* at 505. The interviewing officer and Bush then had this exchange:

| | |
|---|---|
| Interviewer: | You want my personal opinion? |
| Bush: | Yeah, truthfully. |
| Interviewer: | The truth is always going to be better. That's my personal opinion. |

*Id.* Because the "accused himself initiate[d] further communication, exchanges, or conversations with the police," his earlier invocation of the right to counsel no longer controlled. *Id.* at 513 (alteration in original) (quoting *Edwards*, 451 U.S. at 484–85). We also explained that this exchange was not "indicative of the circumstance which the prophylactic rule in *Edwards* was designed to prevent" because the officers "were not badgering Bush to waive his invocation of right to counsel in any way." *Id.* (internal quotation marks omitted).

Like the statements in *Bush*, Hitchings's statements were "not prompted . . . by police interrogation," but suggest "a willingness and a desire for a generalized discussion about the investigation." *United States v. Ware*, 338 F.3d 476, 481 (6th Cir. 2003) (internal quotation marks omitted); *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983) (plurality op.) (opining that the suspect's question—"Well, what is going to happen to me now?"—demonstrated "a willingness and a desire for a generalized discussion about the investigation"). The district court therefore did not err in finding that Hitchings reinitiated his conversation with law enforcement.

Hitchings validly waived his right to counsel after reinitiating discussions with the officers. As mentioned above, Kinzig advised Hitchings of his *Miranda* rights during the first few minutes of the interrogation. About 40 minutes later, Hitchings invoked his right to counsel and subsequently reinitiated conversation with the officers. Then, he started repeatedly hitting himself on the head, and the officers handcuffed him. Once he regained his composure, he asked Kinzig not to leave the interview room and said: "Please sit down. I'll tell you . . . I'll tell you whatever you want to know." Before Kinzig asked Hitchings any further questions, she asked him several times if he wanted an attorney. Hitchings explained that he wanted to continue the interview and that he did not want an attorney before doing so. Kinzig expressed her discomfort with continuing the interview because Hitchings had asked for an attorney, and then this exchange took place:

16

| | |
|---|---|
| Kinzig: | Again, I'm not feeling very comfortable right now because you asked for a lawyer. But if you want to talk to us, we'll talk to you. But I'm not feeling real comfortable. |
| Hitchings: | I will talk to you, I will talk to you. |
| Kunkleman: | I, I want, you know how you wanted your questions answered? William, I want my question answered. Yes or no, do you want a lawyer now? |
| Hitchings: | I do not need a lawyer, no. I don't need a lawyer[.] |
| Kunkleman: | Yes or no, do you want a lawyer now? |
| Hitchings: | No, I do not need a lawyer, no. |

The totality of the circumstances show that Hitchings waived his right to counsel after he was advised of his *Miranda* rights. He later invoked his right to counsel during the interrogation but reinitiated discussions with the officers and, again, knowingly and voluntarily waived his right to counsel.

**D.**

Finally, Hitchings argues that the district court erred by finding that his confession was voluntary. A defendant's confession is admissible at trial only if he makes it "freely, voluntarily, and without compulsion or inducement of any sort." *Wilson v. United States*, 162 U.S. 613, 623 (1896). Although we look to the totality of the circumstances to assess the voluntariness of a confession, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Connelly*, 479 U.S. at 167 (internal quotation marks omitted). "Police action is only coercive when it 'overbear[s] the accused's will to resist.'" *United States v. Jacobs*, 63 F.4th 1055, 1058 (6th Cir. 2023) (alteration in original) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). Police action overbears the will of the accused if: "(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear [the] defendant's will;

17

and (3) [the] defendant's will was, in fact, overborne as a result of the coercive police activity." *Id.* (alterations in original) (quoting *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991)).

Hitchings cannot show that the interviewing officers' actions were objectively coercive. As discussed above, the officers spoke to Hitchings in a conversational tone for most of the interview and they never brandished their weapons nor threatened Hitchings. No officer told Hitchings he had to talk to law enforcement. In fact, they told him several times he could refuse to answer questions as he wished. The only time the officers raised their voice or otherwise applied force against Hitchings was during his emotional outburst. Kinzig testified that she and Kunkleman handcuffed him during this outburst only because Hitchings was "hitting his head on the table and hitting his head with his fist." After his outburst, the interview returned to its earlier conversational tone. Although the interview lasted for almost six hours, the interviewing officers gave Hitchings water, offered him food, and took several breaks throughout the questioning. Further, when Hitchings requested time to think, the interviewing officers always complied. These actions are like conduct "we've previously held is not coercive." *Jacobs*, 63 F.4th at 1058–59 (citing *Luck*, 852 F.3d at 623).

Without evidence of coercion, Hitchings cannot show that the district court erred by finding his confession admissible. This conclusion is true even though the recorded interview shows that Hitchings was suffering from some degree of emotional distress and that he had used both marijuana and methamphetamine before officers apprehended him. *See Luck*, 852 F.3d at 623 ("[E]ven if [a] defendant's cognitive or volitional capacity was impaired, that 'is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary.'" (quoting *United States v.*

*Newman*, 889 F.2d 88, 94 (6th Cir. 1989)).  We therefore conclude that Hitchings voluntarily answered the interviewing officers' questions.

## IV.

For these reasons, we **AFFIRM** the district court's denial of Hitchings's motion to suppress.