RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LINDELL LUCK,

*Defendant-Appellant.*

No. 15-5746

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:13-cr-20303—Samuel H. Mays, Jr., District Judge.

Argued: March 9, 2017

Decided and Filed: March 31, 2017

Before: CLAY, SUTTON, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jeffrey B. Lazarus, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Kevin G. Ritz, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Jeffrey B. Lazarus, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Kevin G. Ritz, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

GRIFFIN, Circuit Judge. Charged with possession and distribution of child pornography, defendant Lindell Luck sought, unsuccessfully, to force the government to stipulate to the child-pornographic nature of the material recovered from his laptops. On appeal, he contends that the

district court's refusal to force the stipulation violated the Supreme Court's decision in *Old Chief v. United States*, 519 U.S. 172 (1997), which enforced a similar stipulation for felon status in felon-in-possession cases. We disagree. Overlooked in defendant's presentation is an important caveat from *Old Chief*. "[O]ur holding," *Old Chief* said, "is limited to cases involving proof of felon status," *id.* at 183 n.7—an explicit limitation that this court has relied on in rejecting previous attempts to expand *Old Chief*. We do so again, and hold that, in light of the explicit limitation on *Old Chief*'s holding, as well as the material distinctions between felon status and the nature of the images in child pornography cases, the district court did not err in refusing to force the government to stipulate. Finding no reversible error in defendant's remaining claims on appeal, we affirm.

## I.

In August 2012, agents with the FBI Crimes Against Children Task Force discovered someone at 3425 Porters Gap Road in Halls, Tennessee, was using the Internet to download and share child pornography. They sought a search warrant for the home, which they executed on October 24, 2012. When they arrived, lead agents Aaron Thompson and Keith Melancon introduced themselves to the homeowner, Donnie Luck, and asked that he gather the other family members in the living room. There, agents told Donnie, his wife, Lynne Luck, and their twenty-one-year-old, live-in son (and defendant here), Lindell Luck, the reason for their visit. According to Thompson, they told the Lucks they were free to leave while they executed the search warrant, but that they would like to ask them some questions. Although Donnie and Lynne did not recall being told they could leave, everyone agreed to answer questions.

Agents began with a round of general investigative questions until an answer to one question caught Thompson's attention: Lindell indicated that he had used something called a peer-to-peer file sharing network—the type of computer program that agents knew was used to download and share the pornographic material from 3425 Porters Gap Road. When agents heard this, they asked to speak with Lindell privately, offering to spare Lindell from having to answer embarrassing questions in front of his parents. Lindell and his parents agreed, and he and the agents departed to a nearby bedroom.

Once everyone got settled, Lindell divulged that he had viewed child pornography when he was younger. He told agents that a friend downloaded files onto his laptop using a peer-to-peer network, and also gave him a thumb drive with child pornography. The laptop, however, was not in the house because it was being repaired for viruses. Agents asked if they could have a look at his online activity, and Lindell agreed. After their conversation ended, Lindell rejoined his mother and father in the living room.

Meanwhile, the agents' search progressed to defendant's bedroom, where they found another laptop that the family failed to disclose during the initial round of questioning. They asked to speak with Lindell again, and he agreed. Confronted with the latest discovery, Lindell changed his story. He told agents that he had viewed child pornography as recently as a week and a half ago, describing the type of peer-to-peer network he used to do so. He also clarified that *he* put child pornography on the thumb drive, not his friend. Agents asked if he would like to put his latest statement in writing. He agreed, but not before agents advised him of his right to remain silent, that any statement he made was completely voluntary, and that he did not have to give a statement. He dictated the following statement to agent Thompson:

> I, Lindell "Logan" Luck, am giving this statement freely and voluntarily without threats or force from Law Enforcement. I have been advised of my right to refuse such statement and remain silent. I have requested Special Agent Thompson to write this statement as I tell it in my words.
>
> I began looking at child pornograph [sic] when I was younger with a friend, Colton, and it grew into a habit. I do not get sexual gratification from it. I do it to relieve stress because it gives me a sense of control in my life. I want to stop but I've never been able to stop on my own from looking at it. I'm sorry for putting everyone though what I've put them through — my family.

After reviewing Thompson's transcription for accuracy, Lindell signed the statement. The search ended a short while later.

According to Lindell, he has no memory of anything that occurred during the search, a consequence, he says, of the medications he was taking that "pretty much make [him] turn into a zombie anywhere between an hour and a half to two hours" after he wakes up.

The fruits of the search resulted in a three-count indictment against Lindell for distributing and possessing child pornography, in violation of 18 U.S.C. § 2252(a)(2), (a)(4)(B). In the lead up to trial, the parties filed three motions that are at issue in this appeal.

First, defendant filed a motion to suppress the statements he gave to agents, contending that they were the product of "custodial interrogation" without the required *Miranda* warnings. He alternatively argued that the statements were involuntary under the Due Process Clause. The district court disagreed with both contentions and denied the motion.

Defendant also filed a motion to require the government to stipulate that the images recovered from his laptops depicted child pornography, thereby obviating the need to show them to the jury. The district court denied the motion, holding that "[t]he Government is entitled to prove its case free from any obligation to stipulate to the [e]vidence."

Finally, the government filed a motion in limine to exclude evidence of Lindell's physical and mental health and learning disability. Deferring decision on the motion until trial, the district court granted the motion after defendant made an offer of proof about what Lynne would say regarding defendant's medical history and its lasting effects. The district court ruled that her testimony was inadmissible because, although probative in some respects, it raised a "significant risk of confusion about what the case is about."

At trial, defendant also attempted to put Donnie on the stand for the sole purpose of invoking his Fifth Amendment right against self-incrimination in response to questions about whether he viewed or downloaded child pornography. Over defendant's objection, the district court prevented him from doing so, finding that it would have "no probative value at all."

At the close of trial, the jury found defendant guilty as charged, and the district court sentenced him to 78 months in prison.

## II.

Defendant first argues that his statements to agents were inadmissible for two alternative reasons: one, he was "in custody" when agents questioned him without first advising him of his rights; and two, the agents used coercive conduct that rendered his statements involuntary under

the Due Process Clause. In resolving these claims, we "review[] the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Binford*, 818 F.3d 261, 267 (6th Cir. 2016).

A.

Law enforcement officials are required to advise a person of their *Miranda* rights before engaging in "custodial interrogation." *See Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). As the quoted phrase implies, this requirement applies "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In determining whether a person is "in custody" for purposes of *Miranda*, courts look to "the objective circumstances of the interrogation . . . to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (internal quotation marks and citation omitted). The ultimate inquiry is whether, under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest. *Id.* If so, he is "in custody" for purposes of *Miranda*. Guiding the inquiry are four, non-exhaustive factors: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

Under the totality of the circumstances, defendant was not "in custody." To begin, defendant was questioned in his home, a fact that typically weighs against being "in custody." *Panak*, 552 F.3d at 466. As for "the length and manner of the questioning," *Hinojosa*, 606 F.3d at 883, agents interviewed defendant for roughly an hour, in two separate 20-to-30 minute sessions—not lengthy by our standards. *See Mathiason*, 429 U.S. at 495. During that time, agents spoke to defendant in a calm, conversational manner, never becoming aggressive or brandishing their weapons. Nor was defendant's "freedom of movement" restrained in any significant way. After agents asked to speak with defendant separately, defendant and his parents acquiesced, and he voluntarily accompanied them to a nearby bedroom. During each session, agents kept the door open and did not block the exit, positioning themselves either in a

chair, on the floor, or standing across the room. Although agents did not tell defendant he was free to leave, they did inform him that he did not have to provide a statement. They also informed the entire family at the start of the search that they were free to leave the home. Defendant stresses that he was "a 21-year-old kid who never lived outside of his parents' home, who ha[d] severe learning disabilities, and [who] was coming off sleeping medications from the night before," but none of these facts, except maybe age, *see J.D.B. v. North Carolina*, 564 U.S. 261, 277 (2011), are relevant under the objective "custody" inquiry, and the fact that he was a twenty-one-year-old adult does not weigh in his favor. Taken together, nothing about the objective circumstances of the interrogations indicate that a reasonable person in defendant's position would suspect he was under arrest or otherwise not free to leave.

Defendant's remaining arguments to the contrary are unpersuasive. First, he argues that the district court relied too heavily on the location of the questioning. We agree with defendant that location is not decisive in the custody analysis. The team with the home-field advantage will not necessarily win the sporting contest, but it is also called a home-field advantage for a reason—individuals are more comfortable speaking up and asserting themselves in the familiar confines of their home. *See Panak*, 552 F.3d at 466 ("[A]ll individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house."). And, contrary to defendant's concern, the district court recognized that location is not conclusive of custody, observing that law enforcement agents can easily turn the home into an inhospitable setting by, for instance, arriving in large numbers, using a show of authority like brandishing weapons, or engaging in aggressive questioning. *See id.* (recognizing that these circumstances "may transform one's castle into an interrogation cell"). As discussed above, however, none of these circumstances are present in this case.

Defendant also argues that the district court did not rely heavily enough on Donnie and Lynne's account of what happened in the living room and whether they felt free to leave. We agree that the first-hand perceptions of individuals who are not the interviewee are relevant when setting the scene of the interrogation, *see Thompson v. Keohane*, 516 U.S. 99, 112 (1995), but defendant is wrong to rely on Donnie and Lynne's subjective assessment of their ability to leave to support the proposition that a reasonable person in Lindell's position would not have felt free

to leave. Their actual mindset is no more relevant than that of the interviewee. *See Yarborough v. Alvarado*, 541 U.S. 652, 667–69 (2004). Moreover, the focus of the inquiry is on a reasonable person *in the defendant's shoes*. *United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003). Because Donnie and Lynne were not present during either interview, their account of the objective circumstances of what happened in the living room has only marginal relevance in the analysis.

For these reasons, we conclude that defendant was not "in custody" for purposes of *Miranda*.

B.

Defendant also argues that, regardless of whether he was in custody, his statements to agents were involuntary under the Due Process Clause.

This court uses a three-part inquiry to determine whether a confession is involuntary under the Due Process Clause. We ask: first, whether the police activity was "objectively coercive"; second, whether that coercion was "sufficient to overbear the defendant's will"; and third, whether the coercive conduct was "the crucial motivating factor in the defendant's decision to offer the statements." *Binford*, 818 F.3d at 271 (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

Defendant argues that he was under the influence of sleep medications at the time of the interrogation, rendering him especially vulnerable to the agents' interrogation and making the agents' conduct objectively coercive. There are two problems with this argument—one factual, one legal. First, the agents gave a different factual account. Agent Thompson testified that he did not get the sense that defendant was under the influence of any drugs, alcohol, or medication. And Agent Melancon did not get the impression that defendant, who he says provided clear statements and spoke in complete sentences, was in a zombie-like daze. Moreover, while his parents testified about defendant's lethargic demeanor on a typical morning, they never actually described defendant's demeanor on October 24, 2012. In any event, the district court credited the agents' version of events, a ruling we will not disturb absent "a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Miner*, 774 F.3d 336,

348 (6th Cir. 2014); *see also United States v. Johnson*, 732 F.3d 577, 582 (6th Cir. 2013) (credibility determinations reviewed for clear error).  Defendant offers no reason why the district court's credibility determination was clearly erroneous.

Second, even if defendant's cognitive or volitional capacity was impaired, that "is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989).  According to Agent Thompson and Agent Melancon, there was no coercion.  They spoke in conversational tones, did not threaten defendant or yell at him, and told him he did not have to provide a statement if he did not want to.  Defendant was not arrested or otherwise prevented from leaving the agents' presence.   These circumstances amply demonstrate that defendant's statements were not the product of police coercion.  *See Mahan*, 190 F.3d at 423 (holding that a statement given under similar circumstances was not involuntary).  Defendant does not challenge their account or otherwise argue that the agents' conduct was overbearing or objectively coercive—nor could he, since he testified he has no recollection of the events of October 24, 2012.

But defendant has an answer for this shortcoming.  He contends that because the government failed to record his statements—in violation of a recent Department of Justice policy encouraging the use of recording devices for some interrogations—this court should draw an adverse inference from that fact for purposes of the due process analysis.  There are two problems with this argument, as well; again, one factual and one legal.  First, the 2014 policy did not exist at the time agents questioned defendant, and, by its own terms, it only applies to individuals who have been arrested.  Dep't of Justice, Attorney General Holder Announces Significant Policy Shift Concerning Electronic Recording of Statements (May 22, 2014), https://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-concerning-electronic-recording (accessed March 27, 2017).  Defendant was not "in custody," much less arrested.  Thus, even if there is merit to the suggestion, there is no factual basis to endorse it in this case.

But defendant's argument has a more fundamental flaw:   "[A] violation by the government of its internal operating procedures, on its own, does not create a basis for

suppressing [statements]." *United States v. Myers*, 123 F.3d 350, 355–56 (6th Cir. 1997). In other words, that the Department of Justice happened to conclude, in its professional judgment, that it was wise policy to encourage recording of interviews does not mean the new technique is now required in order to comport with due process. As with Mr. Herbert Spencer's Social Statics, the Constitution does not enact the internal operating procedures that happen to be in vogue at the Department of Justice, or any other government agency. *See Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting).

For these reasons, the district court did not err in holding that defendant's statements were voluntary under the Due Process Clause.

## III.

Defendant also challenges three evidentiary decisions. First, whether the government was forced to stipulate to the child-pornographic nature of the images recovered from defendant's computers. Second, whether the district court erred in excluding evidence of his prior medical history and learning disability. And third, whether the district court erred in prohibiting Donnie Luck from taking the stand in order to invoke his Fifth Amendment privilege against self-incrimination. We review such decisions for an abuse of discretion. *United States v. Odeh*, 815 F.3d 968, 982 (6th Cir. 2016); *United States v. Clark*, 988 F.2d 1459, 1464 (6th Cir. 1993).

## A.

Defendant argues that the district court erred in denying his motion to stipulate to the nature of the images recovered from his laptops.

As a general rule, a "defendant has no right to selectively stipulate to particular elements of the offense." *United States v. Boyd*, 640 F.3d 657, 668 (6th Cir. 2011) (quoting *United States v. Hebeka,* 25 F.3d 287, 291 (6th Cir. 1994)) (internal quotation marks omitted). Twenty years ago, the Supreme Court carved out an exception: the government cannot refuse a defendant's offer to stipulate to his felon status in federal felon-in-possession prosecutions. *Old Chief*, 519 U.S. at 191–92. The reason, the Court said, was because the general rule has "virtually no

application when the point at issue is . . . dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." *Id.* at 190. Because the *nature* of a prior conviction is not an element of the felon-in-possession offense and the *fact* of a prior conviction is "entirely outside the natural sequence of what the defendant is charged with thinking and doing to commit the current offense," "[p]roving [felon] status without telling exactly why that status was imposed leaves no gap in the story of a defendant's subsequent criminality." *Id.* at 191. Lacking any justification to apply the general rule, the Court held that a district court abuses its discretion when it refuses to accept a stipulation regarding felon status in felon-in-possession prosecutions. *Id.* at 191–92.

Since then, defendants have sought to expand *Old Chief*'s exception beyond the issue of felon status. *See Odeh*, 815 F.3d at 982 (prior conviction in naturalization fraud prosecution); *Boyd*, 640 F.3d at 669 (serious bodily injury in carjacking prosecution); *United States v. Owens*, 159 F.3d 221, 225–26 (6th Cir. 1998) (witness bias in gambling conspiracy prosecution). This court has consistently rejected such requests, relying on the explicit disclaimer in *Old Chief*'s footnote 7 that "[its] holding is limited to cases involving proof of felon status." *Old Chief*, 519 U.S. at 183 n.7; *see, e.g.*, *Odeh*, 815 F.3d at 982 ("Because this case does not involve a prosecution under the felon-in-possession statute, the *Old Chief* exception does not apply." (citing *Old Chief*, 519 U.S. at 183 n.7)); *Boyd*, 640 F.3d at 668 ("The Court explicitly limited its holding 'to cases involving proof of felon status.'" (quoting *Old Chief*, 519 U.S. at 183 n.7)).

This case involves yet another request to expand *Old Chief*, this time in the context of images depicting child pornographic material. As the parties point out, this court has rejected similar requests on at least two occasions, though only in unpublished decisions. *See United States v. Mellies*, 329 F. App'x 592, 599–600 (6th Cir. 2009); *United States v. Caldwell*, 181 F.3d 104, 1999 WL 238655, at *6 (6th Cir. 1999) (unpublished table decision). Defendant argues we "should not follow" these prior decisions. He contends that *Mellies* and *Caldwell* are distinguishable because, given the type of material at issue in those cases (CDs, magazines, and films), "the jury had no way of confirming the items in question were in fact child pornography, and presenting the contents to the jury held high probative value." Not so here, defendant says, because the file names of the digital images established that they were child pornography.

This argument fails on several levels. First and foremost, *Mellies* and *Caldwell* are consistent with our published authority that has rejected attempts to expand *Old Chief* on the basis that the Supreme Court limited its holding to the specific element and offense at issue in that case. *See Caldwell*, 1999 WL 238655, at \*6 ("The Supreme Court recognized an exception to this general rule only for stipulations to prior convictions as an element of an offense[.]"); *Mellies*, 329 F. App'x at 599 n.10 ("[T]he Supreme Court unambiguously limited its holding in *Old Chief* to "'cases involving proof of felon status.'" (quoting *Old Chief*, 519 U.S. at 183 n.7)); *see also, e.g.*, *Odeh*, 815 F.3d at 982 ("Because this case does not involve a prosecution under the felon-in-possession statute, the *Old Chief* exception does not apply." (citing *Old Chief*, 519 U.S. at 183 n.7)). Although *Mellies* and *Caldwell* are not binding on us, published cases like *Odeh* are. In light of the practice of this circuit to reject attempts to expand *Old Chief* as a matter of law, any factual nuances between this case and *Mellies* and *Caldwell* are simply irrelevant.

Furthermore, defendant's analysis of *Mellies* and *Caldwell* is faulty. He contends that publishing the actual images was necessary in *Mellies* and *Caldwell* because, given the format of the materials at issue, it was impossible for the jury to determine their illegal nature without seeing the actual images. In contrast, he argues, the jury in this case could determine their nature from the file names. But this reasoning belies the basic premise in these cases: by entering the requested stipulation, there is no need to admit the actual images *or other evidence* to establish that element. Regardless of how else the material in *Mellies* and *Caldwell* could have been identified as child pornography, it was the stipulation—not some other evidentiary means—that would have sufficed to prove that the images depicted child pornography.

But defendant insists that *Mellies* and *Caldwell* are only persuasive authority, which allows us to decide the issue differently as a matter of first impression. That is true; but even if we were writing on a blank slate, critical differences between the felon-status element in felon-in-possession cases and the child-pornographic image element in child pornography cases make it abundantly clear that *Old Chief*'s rationale does not apply in this context. There are at least three material distinctions.

First, the keystone in *Old Chief*'s holding was the fact that felon status was outside the natural sequence of concrete events that the prosecution has an interest in presenting with robust

evidence and a coherent, unbroken narrative. *See Old Chief*, 519 U.S. at 190. Unlike felon status, however, the pornographic nature of the image in a child pornography case plays a vital role in the government's narrative of the concrete events comprising the charged offense. And removing a central chapter in the government's tale, *Old Chief* recognized, risks leaving the jurors puzzled, or worse, ready to "penalize the party who disappoints them." *Id.* at 188–89.

Second, in stark contrast to felon status, the images in a child pornography prosecution have multiple utility, tending to establish both the fact that they are pornographic *and* the fact that defendant acquired and distributed the images *knowing* they depicted child pornography. *Old Chief* recognized the persuasive power of this type of evidence, observing that "a piece of evidence may address any number of separate elements, striking hard just because it shows so much at once[.]" *Id.* at 187.

And finally, *Old Chief* recognized that "the evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment." *Id.* at 187–88. Unlike the felon-in-possession offense, child pornography cases are especially susceptible to a wide range of strong emotional responses, including disbelief that a defendant would commit the act in question. Showing the actual images paints a portrait far more vivid than a sanitized stipulation, thereby establishing for the jury "its human significance," and in the process "implicating the law's moral underpinnings and a juror's obligation to sit in judgment." *Id*.

In sum, none of the major justifications for abandoning the general rule for felon status stipulations are present. To the contrary, this case implicates all the traditional justifications *Old Chief* gave for adhering to the general rule that "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Id.* at 186–87.

For all these reasons, the district court did not err in refusing to force the government to stipulate to the nature of the images recovered from defendant's devices.

B.

Defendant next argues that the district court erred in excluding evidence of his prior medical history and learning disability under Federal Rule of Evidence 403. *See* Fed. R. Evid. 403 (providing that otherwise relevant evidence is inadmissible "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence").

During his case-in-chief, defendant sought to present testimony from his mother regarding his medical history and learning disability. Outside the jury's presence, Lynne proffered testimony about defendant's diagnosis with leukemia at age eight, his three years of chemotherapy, and how one round of chemotherapy went wrong, causing lasting side effects on his joints, memory, and ability to read and write. After hearing the proffer, the district court ruled that her testimony was probative in two respects (how the statements to agents were made and whether he knowingly possessed child pornography), but that the probative value was outweighed by the "significant risk" of juror confusion. The court explained:

> The fact that he took Benadryl and melatonin is in the record already. What its impact was on him is certainly appropriate. He could probably even have why he took it, because he had knee and ankle pain. There's no prejudice in that coming in, no unfair prejudice.

> If we go back through his history of treatment for leukemia when he was 8 years old and three years of chemotherapy, which is, when, from 8 to 11, and procedures that were not handled correctly, that has a very high risk of unfair prejudice; and it's not at issue in this case.

The court concluded, "I'm afraid it becomes the elephant in the room; and all they look at is the elephant."

Defendant argues the district court abused its discretion in excluding Lynne's testimony. Not only did the district court apply the wrong legal standard, defendant says, it also mischaracterized Lynne's testimony as being about "procedures that were not handled correctly. As for the first claim, a contextual reading of the transcript demonstrates that the district court was aware of the correct legal standard. Several lines after stating that the probative value was "outweighed" by unfair prejudice (not *substantially* outweighed"), the district court stated:

"It's a significant – there's a *significant* risk of confusion about what the case is about." (Emphasis added.) While not a verbatim recitation of Rule 403, the district court's reasoning reflects an understanding of the governing legal framework. And as for the second claim—the district court's characterization of Lynne's testimony—while the primary purpose of Lynne's testimony might have been to highlight defendant's current mental and physical state, she did not limit her proffer to that evidence. Instead, she testified about the entire series of unfortunate events that befell defendant as a child. In this context, the district court's concern about the case becoming about "procedures that were not handled correctly" was well-founded.

Defendant also contends that the district court did not adequately explain why the risk of confusion justified exclusion in this case. But the ruling was self-explanatory: the case was about whether, and under what circumstances, defendant confessed to agents on October 24, 2012. The fact that defendant was treated for leukemia in 2001 had no bearing on that issue. As the district court stated, what was relevant was the fact that defendant was taking medications that may have affected his state of mind on the day of the search, not the entire back story as to why he was taking them. Defendant was able to put in evidence regarding his state of mind on the day of the search, including the side effects of his medications.

The same goes for the evidence of defendant's learning disability. Although this evidence was certainly relevant to the circumstances under which he confessed to authorities, we cannot say the evidence was so probative that the district court committed a clear error of judgment in excluding it because of "a significant risk" of juror confusion. In fact, the rationale for the district court's decision makes sense: while the mere fact that he had a learning disability was potentially relevant, the entire back story as to why he had the learning disability was not. Defendant sought to present the entire saga to the jury, medical history and all. It was in this context that the district court reasonably concluded that the proffered evidence would present a significant risk of juror confusion: "I don't think it's appropriate for the case to be about the defendant's history of medical treatment, which is what we're going to have if we go down this road."

Moreover, even assuming the district court abused its discretion in excluding evidence of defendant's learning disability, the error, if any, was harmless. A non-constitutional evidentiary

error is harmless if the government can "show by a preponderance of the evidence that the error did not materially affect the verdict." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) (emphasis omitted). The government makes that showing here. The learning disability evidence had no bearing on whether defendant committed the offenses, only the circumstances under which he made statements to authorities. Setting aside his statements, the government presented evidence that a laptop found in defendant's bedroom, which was password-protected with his username, contained peer-to-peer software and child pornography. There was similar evidence for defendant's second laptop. The government also presented evidence that someone at defendant's address was using the Internet and peer-to-peer networks to share child pornography files. This wealth of unimpeached evidence that defendant possessed and distributed child pornography using his laptops supplies this court with "a fair assurance that the outcome of [the] trial was not affected by [any] evidentiary error." *United States v. Johnson*, 440 F.3d 832, 847 (6th Cir. 2006) (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005)).

C.

Finally, defendant appeals the district court's ruling prohibiting Donnie Luck from taking the stand in order to invoke his Fifth Amendment privilege against self-incrimination.

The practice of calling a witness for the sole purpose of invoking the right against self-incrimination is "so imbued with the 'potential for unfair prejudice' that a trial judge should closely scrutinize any such request." *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980) (quoting *United States v. Maffei*, 450 F.2d 928, 929 (6th Cir. 1971)). This close scrutiny is required for a variety of reasons, not the least of which is the concern that the jury will improperly infer guilt from the exercise of the privilege, *id.* at 1148, which in turn "creates potential for collusion between the witness and defendant[,]" *United States v. Ballard*, 280 F. App'x 468, 471 (6th Cir. 2008). This potential for collusion "is particularly problematic when the defendant and witness have a personal or familial relationship[.]" *Id.*

Defendant admits that the purpose of having Donnie take the stand was to plant the idea that he, not Lindell, was the perpetrator. Because the law forbids the very purpose for which

defendant sought to use Donnie's testimony, *see id.* at 470 ("[A] jury is 'not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege.'" (quoting *Bowles v. United States,* 439 F.2d 536, 541 (D.C. Cir. 1970)), allowing Donnie to take the stand would have served no useful evidentiary purpose. Given the absence of probative value in having Donnie take the stand, and the heightened potential for collusion given the father-son relationship, we have no difficulty in holding that the district court exercised sound discretion in prohibiting Donnie from taking the stand for the sole purpose of pleading the Fifth.

Defendant raises several arguments to the contrary, but they do not compel a different conclusion. Defendant first argues that the district court failed to adequately consider the prejudice to his case in not putting Donnie on the stand. But the court did address this issue by observing that the jurors would have been forbidden from drawing the very inference he hoped they would draw from his testimony. Defendant may have been unable to present what he considered favorable evidence, but because the law forbade the jury from considering Donnie's testimony for the primary purpose defendant sought to use it, any relevance was outweighed by the risk of unfair prejudice to the government.

Defendant also argues that the district court's decision violated his Sixth Amendment right to compulsory process. This argument is misplaced. "A defendant's right to compel testimony yields to a witness's assertion of his or her Fifth Amendment privilege when the claimed privilege is grounded on a reasonable fear of prosecution." *United States v. Highgate*, 521 F.3d 590, 593 (6th Cir. 2008). Defendant does not argue that his father's invocation was not grounded in a reasonable fear of prosecution.

Finally, defendant claims that affirming the district court on this issue will have a "chilling effect" on trial counsel, discouraging them from preparing their witnesses before trial. This argument does not give us pause. For one, it is difficult to imagine trial counsel will stop preparing their witnesses for trial on the off chance that they might disclose their desire to invoke their Fifth Amendment right. And two, to the extent defendant claims attorneys will be tempted to abandon their duty of candor under this regime, needless to say, this court will not fashion legal rules on the premise that attorneys might violate their professional responsibilities.

*Cf. Strickland v. Washington*, 466 U.S. 668, 688 (1984) (stating that law presumes that counsel will fulfill their role in the adversary system).

IV.

For these reasons, we affirm defendant's convictions.