NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0389n.06

Nos. 19-5945/6024

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jul 07, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| LEESHAWN HOWARD (19-5945), JONATHAN | ) | COURT FOR THE EASTERN |
| JOSUE MACIAS (19-6024), | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: BATCHELDER, BUSH, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. A jury convicted Leeshawn Howard and Jonathan Macias of conspiring to distribute and to possess with intent to distribute fifty grams or more of methamphetamine after police officers discovered two packages of methamphetamines in their car at a traffic stop. They were also convicted of related firearm offenses. Howard and Macias appeal their convictions, arguing that the evidence against them was obtained in violation of the Fourth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966). Macias also argues for the first time on appeal that he should have a new trial because the verdict was contrary to the manifest weight of the evidence. Because Howard and Macias's suppression arguments are meritless and because the district court had no authority to grant Macias a new trial, we AFFIRM.

I.

On the morning of January 15, 2018, Trooper William Connors of the Tennessee Highway Patrol was on duty and parked in the median of I-40 in Jefferson County, Tennessee, facing

eastbound traffic. At 10:08 AM, a green Saturn Vue SUV caught his attention. As the Vue approached, it moved from the center of the three-lane highway to the far-right lane, behind a slower-moving tractor trailer. The Vue was traveling at about sixty-five miles per hour, the speed limit for passenger vehicles, while the tractor trailer was moving at about fifty-five miles per hour, the speed limit for commercial vehicles. As the Vue passed, Connors noticed that the driver, Howard, was looking at him "out of the corner of his eye." Connors found this behavior suspicious, so he pulled out of the median and began to follow the Vue.

The Vue was initially following the tractor trailer at a distance of about three seconds. As it continued to travel down the right lane, however, the Vue drew progressively closer to the tractor trailer until it was only about one second behind. At one point the tractor trailer began to slow down incrementally, and the Vue had to brake because it was following so closely. Connors also thought he saw the Vue twice cross over the white line dividing the right lane from the shoulder. These facts led Connors to conclude that the Vue was following too closely in violation of Tenn. Code Ann. § 55-8-124(a) and failing to drive as nearly as practicable within a single lane in violation of Tenn. Code. Ann. § 55-8-123(1). At 10:09 AM, Connors merged into the right lane and activated his blue lights. The Vue immediately pulled over. As the Vue was pulling over, Connors radioed for a records check on the Vue's North Carolina license plate.

Connors initially approached the Vue from the passenger side. While approaching he noticed that there were two men in the car—the driver, Howard, and a passenger, Macias. He also noticed that there was no luggage in the SUV. Connors saw that Macias was lying completely reclined but was awake and talking to Howard. Because it was hard to get a good look at Macias, Connors decided it was safer to change course and approach on the driver's side. After opening Howard's door, Connors asked for his driver's license, registration, and proof of insurance.

Howard was nervous, more nervous in Connors' estimation than a typical driver at a traffic stop. He was breathing heavily, and his hands were shaking as he passed his license to Connors. Macias remained reclined and stared straight ahead without looking at Connors. When Howard opened the glove compartment to get his registration, a handgun came into view, which Howard immediately claimed as his. Connors also observed that both Howard and Macias had tattoos on their left cheeks, which in his experience "could indicate potential gang activity." Howard produced his license and registration but could not find his proof of insurance.

Connors asked Howard to step out of the car and stand by the passenger side of his cruiser. As Howard left the Vue, Connors came around to the passenger side and asked Macias to put his hands on the center console. Macias complied, and Connors put the gun out of reach on the roof of the Vue. Connors then joined Howard at the side of his cruiser. He offered to let Howard sit in the back of the patrol car to get out of the cold, but Howard declined. In response to questions about his itinerary, Howard told Connors that he and Macias had come to Tennessee for a vacation in the mountains and were now returning to Raleigh, North Carolina. Howard could not recall the name of the city or hotel where they had stayed but related that they had come to Tennessee the previous day on an eight-hour drive from Raleigh.

Connors asked Howard if he had ever been arrested and whether he was on probation or parole, to which Howard responded no. He then asked who Howard's passenger was. Howard at first said that Macias was his cousin, but then clarified that by "cousin" he meant friend, not blood relative. Following that, Connors asked Howard what he did for a living. When Howard replied that he did not work, Connors asked him how he could afford to go on vacation. Connors then asked more questions about Howard's travel plans. Howard explained that he and Macias had

gone to Tennessee to meet some girls from Raleigh for vacation. The girls never showed up, however, so he and Macias just went to Waffle House.

As Connors finished talking to Howard, he radioed for backup. He then walked back to the Vue and asked Macias whether he could find the proof of insurance. While Macias was searching, Connors asked Macias about his arrest record and about his and Howard's itinerary. Like Howard, Macias could not recall the town or hotel where the two of them had stayed. At first, he said they had gone to Tennessee to visit family. Then he said they had gone to see some girls from Tennessee. Macias claimed that he and Howard did meet up with the girls and that they had "partied all night." When Macias was unable to find proof of insurance, Connors returned to Howard. At that point it was 10:19 AM, a little under ten minutes after Connors had initiated the traffic stop.

Connors then began to ask Howard whether he had any drugs or anything else illegal in the car, as well as follow-up questions about his and Macias's travel plans. Connors also asked Howard if he could search the car, and Howard gave permission. Connors waited until backup arrived to search the Vue. While waiting for backup, he performed a records check on Howard's and Macias's licenses while continuing to question Howard. The records check revealed that Macias had a felony-drug conviction and that Howard had several misdemeanor convictions. Another officer, Trooper Woods, arrived on the scene at 10:29 AM, twenty minutes after Connors first pulled the Vue over. A third officer, Trooper Rabun, arrived shortly thereafter. Connors directed Howard and Macias to sit in Woods' patrol car. Rabun then brought his drug-detection dog to the Vue. The dog alerted on the passenger side of the car at 10:34 AM.

After the dog sniff, the officers searched the Vue. They found a package of methamphetamines under the driver's seat and another under the front passenger seat. Connors

then went back to Howard and Macias and read them their *Miranda* rights. Macias claimed ownership of the drugs as well as of a second handgun, which the officers had discovered in the center console of the Vue. The officers then arrested Howard and Macias.

A grand jury charged Howard and Macias with conspiracy to distribute and possess with intent to distribute fifty grams or more of methamphetamine in violation of 21 U.S.C. §§ 841 and 846 and with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). The grand jury also charged Macias with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Howard and Macias filed a joint motion to suppress all evidence obtained at the stop. They raised three arguments. First, they claimed the stop violated the Fourth Amendment from the outset because Connors lacked probable cause to believe Howard had committed a traffic offense. Second, they argued that even if the stop was a valid traffic stop, Connors unlawfully extended the stop by investigating matters unrelated to Howard's alleged traffic violation without reasonable suspicion of criminal activity. Third, they claimed that Connors interrogated them when they were in police custody without first apprising them of their *Miranda* rights.

The district court assigned the motion to a magistrate judge, who held a suppression hearing. The evidence at the hearing principally consisted of Connors' testimony and the dashcam footage from his cruiser. After the hearing, the magistrate judge issued a report and recommendation recommending that the motion be denied in full. *United States v. Howard*, No. 3:18-CR-29-TAV-HBG, 2018 WL 6595364, at *18 (E.D. Tenn. Oct. 5, 2018). On the first issue, the magistrate judge concluded that Connors had probable cause to believe that Howard both was following the tractor trailer too closely and had failed to stay within one lane by crossing over the shoulder line. *Id.* at *11–12. On the second issue, he concluded that Connors had reasonable

suspicion that criminal activity was afoot by the time he finished questioning Macias while Macias was searching for proof of insurance. Thus, his continued detention of Howard and Macias while he waited for backup and searched for drugs was reasonable. *Id.* at \*14–15. On the third issue, the magistrate judge found no *Miranda* violation because Howard and Macias were not in custody prior to the discovery of drugs in the Vue, at which point they were promptly advised of their rights. *Id.* at \*17.

Howard and Macias filed joint objections to the report and recommendation, in which they largely restated the arguments they presented in their initial motion. The district court overruled their objections, adopted the report and recommendation in full, and denied the motion to suppress. *United States v. Howard*, No. 3:18-CR-29-TAV-HBG, 2018 WL 6061439, at \*9 (E.D. Tenn. Nov. 20, 2018).

Howard and Macias proceeded to a joint trial, where they moved for a judgment of acquittal after the government's case. The district court denied the motion, and the jury convicted them on all counts. Macias then renewed his motion for a judgment of acquittal and moved for a new trial, raising again the arguments he and Howard had made in their suppression motion. He also asserted that both his motions should be granted because the government had failed to prove "the required element of a conspiratorial agreement," but he made no argument to support this assertion. The district court denied both motions. *United States v. Macias*, No. 3:18-CR-29-TAV-HBG-2, 2019 WL 3255164, at \*3 (E.D. Tenn. July 19, 2019).

Howard and Macias each filed a timely notice of appeal.

II.

Howard and Macias renew their suppression arguments on appeal. They claim that (1) Connors lacked probable cause to initiate the traffic stop, (2) even if the traffic stop was valid,

Connors exceeded its proper scope, and (3) Connors unlawfully questioned them without apprising them of their *Miranda* rights.

In an appeal from the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Ramamoorthy*, 949 F.3d 955, 964 (6th Cir. 2020). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## A.

Howard and Macias first argue that Connors' initial decision to stop their vehicle violated their Fourth Amendment rights. They claim that the dashcam video shows that the Vue was following at a reasonable distance and did not cross the line dividing the shoulder from the highway; therefore, they say Connors lacked probable cause to believe Howard was committing a traffic violation.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. This is the case regardless of "the actual motivations of the individual officers involved." *Id.* at 813. The district court ruled that Connors had probable cause to believe that Howard was both following too closely in violation of Tenn. Code Ann. § 55-8-124(a) and failing to drive as nearly as practicable within a single lane in violation of Tenn. Code Ann.

§ 55-8-123(1). Connors' decision to stop the Vue was lawful provided he had probable cause for at least one of these offenses.[1]

Tenn. Code Ann. § 55-8-124(a) provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Violation of this provision is a misdemeanor under state law. *Id.* § 55-8-124(e). Tennessee courts have not "delineat[ed] a standard for what constitutes a 'reasonable and prudent' following distance."[2] *Collazo*, 818 F.3d at 255. Faced with "this interpretive vacuum, this court has consistently turned to the Tennessee Comprehensive Driver's License Manual (the Manual) for guidance." *Id.*

Prior to 2010, the Manual "provided that vehicles should 'maintain at least one car length for every ten miles per hour' of velocity." *Id.* (quoting *United States v. Huff*, 630 F. App'x 471, 497 (6th Cir. 2015)). Since 2010, the Manual has defined a safe following distance in terms of seconds rather than car lengths. *Id.* The Manual now provides that drivers should generally maintain a following distance of at least two seconds. Tenn. Dep't of Safety & Homeland Sec'y, *Tennessee Comprehensive Driver License Manual* 48–49 (July 1, 2018 ed.). During "interstate

---

[1] Even if Connors lacked probable cause, reasonable suspicion of a traffic violation might have sufficed. In earlier decisions, we had "asserted, albeit in dicta, that reasonable suspicion of a completed misdemeanor is not sufficient to justify an investigatory stop." *United States v. Collazo*, 818 F.3d 247, 254 (6th Cir. 2016) (quoting *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008)). Recently, however, we rejected this per se rule, holding instead that reasonable suspicion of a completed misdemeanor may in some circumstances justify an investigatory stop. *See United States v. Jones*, 953 F.3d 433, 437 (6th Cir. 2020). The government does not argue that reasonable suspicion would have permitted Connors to initiate a traffic stop, however, so we will not consider the question.

[2] In the years since *Collazo*, we are aware of only three Tennessee appellate decisions that cite Tenn. Code Ann. § 55-8-124. *See Trammell v. Peoples*, No. M201602198COAR3CV, 2017 WL 4541771, at *1 (Tenn. Ct. App. Oct. 11, 2017); *State v. Weston*, No. E201501530CCAR3CD, 2016 WL 4132543, at *4 (Tenn. Crim. App. Aug. 2, 2016); *State v. Shell*, 512 S.W.3d 267, 272 (Tenn. Crim. App. 2016). None addresses what constitutes a "reasonable and prudent" following distance.

highway driving at higher speeds," however, drivers should maintain a following distance of "[a] minimum of four seconds." *Id.* at 49; *accord Collazo*, 818 F.3d at 255. We have made use of both rules in our post-2010 decisions. *See Collazo*, 818 F.3d at 256–57; *Huff*, 630 F. App'x at 498.

These rules, of course, are just aids in determining whether a driver's following distance is reasonable; they are not independent legal requirements. *See Collazo*, 818 F.3d at 255; *Huff*, 630 F. App'x at 477 (opinion of Boggs, J.). Absent more concrete guidance from Tennessee's courts, however, they serve "as valuable guideposts when determining whether an officer possessed probable cause to stop a vehicle for violating § 55-8-124(a)." *Collazo*, 818 F.3d at 256.

In this case, the magistrate judge found that the Vue was following the tractor trailer at a distance of three seconds when it first passed Connors' parked cruiser, then drew progressively closer until it was only one second behind the tractor trailer. Having independently reviewed Connors' dashcam footage, we conclude that the video supports these findings of fact. The video also reveals that at one point the Vue had to brake on account of the short distance between it and the tractor trailer, even though the tractor trailer did not apply its brakes or suddenly lose speed. Howard and Macias even admit that Howard had to brake because the tractor trailer "was positioned immediately in front of his car." Appellant Br., No. 19-5945, at 21. Additionally, Connors testified that Howard was driving at about fifty-five miles an hour just before Connors turned on his blue lights, but it is clear from the video that the Vue was well less than five to six car lengths from the tractor-trailer at that time.

On these facts, Connors had probable cause to believe Howard's following distance was not reasonable and prudent. The Vue's following distance was much shorter than the minimum distance recommended by the Manual under either the car-length rule or the four-second rule, and we see no countervailing facts to suggest that Howard's following distance was nonetheless

reasonable. Howard and Macias object that it was prudent of Howard to apply his brakes. That is undoubtedly true, but also irrelevant. Connors had reason to believe Howard's conduct had run afoul of § 55-8-124(a) not because Howard braked but because he was so close to the tractor-trailer that it was necessary for him to brake to avoid an accident. *See Helms v. Weaver*, 770 S.W.2d 552, 553 (Tenn. Ct. App. 1989) (stating that "the reasonableness of the distance maintained by the operator of the following vehicle has been measured in terms of the operator's ability to make an emergency stop without striking the forward vehicle"); *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007) (same).

Because Connors had probable cause to believe Howard was violating Tenn. Code Ann. § 55-8-124(a), Howard and Macias were not unreasonably seized when Connors initiated the traffic stop. *Whren*, 517 U.S. at 810. We therefore need not consider whether there was also probable cause to believe Howard had violated Tenn. Code. Ann. § 55-8-123(1).

B.

Howard and Macias next claim that, even if initially lawful, Connors' seizure of them exceeded the scope of a reasonable traffic stop. They raise two principal arguments. First, they maintain that Connors peppered them with irrelevant and intrusive questions. Second, they contend that Connors never developed a reasonable suspicion of criminal activity that would have permitted him to continue detaining them while he waited for the arrival of Woods and Rabun.

1.

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Because "[a] routine traffic stop . . . is a relatively brief encounter," it "'is more analogous to a so-called *Terry* stop . . . than to a formal arrest.'" *Knowles v. Iowa*, 525

U.S. 113, 117 (1998) (second alteration in original) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (citing in turn *Terry v. Ohio*, 392 U.S. 1 (1968))). Traffic stops therefore "must be limited in [both] scope and duration." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (alteration in original) (quoting *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010)).

The scope of an ordinary traffic stop is limited to "address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation omitted). "[D]etermining whether to issue a traffic ticket" and other "ordinary inquiries incident to [the traffic] stop" fall within the scope of the stop. *Id.* at 355 (second alteration in original) (citation omitted). Seeking "evidence of ordinary criminal wrongdoing" does not. *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). If "[unrelated] inquiries . . . measurably extend the duration of the stop," the seizure becomes unlawful. *Id.* (brackets in original) (quoting *Caballes*, 543 U.S. at 333). The critical question is whether the officer's conduct "prolongs—*i.e.*, adds time to—the stop." *Id.* at 357 (quotation marks omitted).

We need not dwell on whether Connors' initial questions were related to the traffic stop because, regardless, Howard and Macias have not shown that any suspicionless questioning prolonged the stop. "An officer's inquiries into matters unrelated to the justification for the traffic stop, [the Supreme] Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100–01 (2005)). "[A]n officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation." *Everett*, 601 F.3d at 492.

In his report and recommendation, the magistrate judge found that, when Connors pulled the Vue over, he "radioed for a check on [its] North Carolina license plate." 2018 WL 6595364, at *8. Then, after asking Howard to step out of the car, "Connors joined Howard at the front passenger side of his patrol car and, while recording information on Howard's driver's license and insurance, Trooper Connors questioned him about his itinerary and his passenger." *Id.* at *9. Connors returned to the Vue and questioned Macias while Macias was searching through the glovebox for proof of insurance. *Id.* The district court adopted the magistrate judge's findings of fact in full.

The magistrate judge's findings of fact explain that Connors' questioning of Howard and Macias occurred while he was obtaining license and insurance information and waiting on a record check of Howard's license plate. Howard and Macias did not object to these findings of fact below, nor do they challenge them on appeal. These findings reveal that Connors' questioning occurred while he was completing tasks related to the traffic stop. Connors was free to question Howard and Macias "to his heart's content" during this time, *Everett*, 601 F.3d at 492, because the questioning did not prolong the stop, *Muehler*, 544 U.S. at 101. *See also United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004) (concluding that the officer's questioning did not prolong the stop because "[a]t that time, [the officer] had not yet completed the initial purpose of the traffic stop because he was filling out the courtesy citation and, as discussed above, was still waiting for the return of the computer check on the vehicle's license"). As a result, Connors' initial questioning did not violate the Fourth Amendment.

2.

Connors' subsequent questioning was also constitutional, because Connors had developed reasonable suspicion of criminal activity by the time Macias had finished looking for proof of

insurance. "A seizure can be extended" for reasons outside the initial scope of the traffic stop "if 'something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Lott*, 954 F.3d at 923 (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). An officer "need not rule out the possibility of innocent conduct" in order to form a reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Although each individual fact forming the basis of an officer's suspicion may be "perhaps innocent in itself," reasonable suspicion nevertheless exists when all the circumstances "taken together warranted further investigation." *Terry*, 392 U.S. at 22. Officers, moreover, may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

The district court concluded that the following factors supported a finding of reasonable suspicion: (1) Howard's initial driving behavior appeared evasive in Connors' experience; (2) Howard was breathing heavily, his hands were shaking, and he seemed more nervous than the typical driver at a traffic stop; (3) Macias remained reclined in his seat and stared straight ahead instead of looking at Connors; (4) Howard and Macias had tattoos on their left cheeks, which in Connors' experience was consistent with gang membership; (5) there was a handgun inside the glove compartment; (6) Howard and Macias had no luggage beyond an extra pair of shoes; and

(7) Howard and Macias gave dubious and inconsistent accounts of their travel plans. We will address each factor in turn and then consider their combined weight.

The first three factors, while relevant, do not by themselves lend much weight to the determination of reasonable suspicion. We note in particular that nervousness can be an "unreliable indicator, especially in the context of a traffic stop," *United States v. Calvetti*, 836 F.3d 654, 666 (6th Cir. 2016) (quoting *Stepp*, 680 F.3d at 665); *see United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015) (collecting cases), though, here, Connors considered Howard to be unusually nervous for the circumstances.

Howard and Macias's facial tattoos, while not criminal in themselves, carry somewhat more weight. Unusual tattoos that in an officer's experience are consistent with gang membership can support a finding of reasonable suspicion, especially where not just one but two suspects happen to have tattoos in the same unusual place. *See United States v. Aragones*, 483 F. App'x 415, 416 (10th Cir. 2012) (per curiam); *United States v. Vasquez-Ortiz*, 344 F. App'x 551, 554 (11th Cir. 2009); *United States v. Jeter*, 175 F. App'x 261, 265 (10th Cir. 2006). That said, Connors did not notice anything suspicious about the designs of the tattoos that could link Howard and Macias to any particular gang. He observed only that facial tattoos are rare and "could indicate potential gang activity." Accordingly, although Howard and Macias's unusual tattoos could be one of several factors supporting an inference that criminal activity is afoot, in this case they cannot be the principal driver of such an inference.

Connors' discovery of a handgun in the glove compartment can likewise contribute to a finding of reasonable suspicion. *See United States v. Cantu*, 50 F.3d 11, 1995 WL 122792, at *3 (6th Cir. 1995) (table decision). Many citizens, of course, keep handguns in their cars for entirely lawful and innocent reasons, and Howard did promptly claim the gun upon its discovery. At the

same time, it was still reasonable for Connors to conclude from his training and experience that "firearms" often "play a role in drug trafficking activity," *see United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (collecting cases admitting police testimony to this effect), and to keep that fact in mind when considering whether Howard and Macias might be involved in criminal activity.

Howard and Macias's conflicting and implausible accounts of their travel plans are the most critical factor here. "[D]ubious travel plans" are often a "strong indicator[] of criminal activity." *Calvetti*, 836 F.3d at 667. This factor is more likely to give rise to reasonable suspicion when "inconsistent explanations are offered," *id.* at 667; *see United States v. Hill*, 195 F.3d 258, 272 (6th Cir. 1999); *United States v. Palomino*, 100 F.3d 446, 450 (6th Cir. 1996); when other circumstances contradict the driver's or passengers' explanations, *see Calvetti*, 846 F.3d at 667 (occupants "had almost no luggage, despite claiming that they were relocating from one state to another"); *Hill*, 195 F.3d at 272 (occupants' claim that they were "moving their sister who was in the military" was suspicious because it had been the officer's "experience that people in the military did not have to move their belongings themselves when relocated"); and when the driver or passengers are ignorant without justification of the details of their own itinerary or plans, *see Stepp*, 680 F.3d at 666–67 (occupants did not know the name or address of the gym to which they were headed when they were less than one hour away); *United States v. Rodriguez*, 485 F. App'x 16, 20 (6th Cir. 2012) (driver claimed to be going to his cousin's bachelor party but did not know the date of the wedding).

In this case, Howard and Macias's accounts of their travel plans were extremely dubious and strongly pointed to the conclusion that they were concealing their true purpose. It is often quite suspicious for a driver to claim he does not know the location of his intended destination, *see*

*Stepp*, 680 F.3d at 667, even though it is possible to imagine an innocent explanation for this, especially if the driver is headed somewhere for the first time. But Howard did not even know the name of the town or hotel where he and Macias had spent their vacation and stayed the previous night. In other words, he claimed not to know where he had woken up that morning and where he had begun driving from just a few hours earlier. That Macias was similarly ignorant when separately asked beggars all belief.

Moreover, Howard and Macias's accounts were contradictory, and Macias's statements were internally contradictory. Howard stated that he and Macias had planned to meet up with some girls from North Carolina but that he and Macias had just gone to Waffle House because the girls never showed up. Macias, on the other hand, first claimed that they were traveling to see family. Then, without explanation, he changed his story, saying instead that they had "partied all night" with some girls from Tennessee. Macias's change of story meant that one or the other or both of his accounts were lies, and neither story was reconcilable with Howard's.

That Howard and Macias were hiding the true nature of their trip is the only rational explanation. The other factors present—Howard and Macias's facial tattoos, Howard's handgun, and their extreme nervousness—reinforced the natural inference that the purpose they were concealing was illicit rather than benign. Accordingly, Connors had reasonable suspicion to believe Howard and Macias were involved in criminal activity and therefore authority to continue detaining them until he could carry out a dog sniff of their car.

C.

Finally, Howard and Macias argue that the statements they made before they were apprised of their *Miranda* rights should be suppressed because they were in police custody for the entirety

of the traffic stop. They contend they were in police custody because they were not free to leave at any point during the stop.

When a suspect is in police custody, officers may not interrogate him without first informing him of certain rights, including the right to remain silent. *Miranda*, 384 U.S. at 444. "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994). *Miranda* "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). In determining whether a suspect is in custody, we first ask whether a "reasonable person" faced with the same circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). But "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). Even if a reasonable person in a suspect's position would not have felt free to leave, the suspect is not in custody unless "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Fields*, 565 U.S. at 509.

"[T]he 'temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.'" *Id.* at 510 (quoting *Shatzer*, 559 U.S. at 113); *accord McCarty*, 468 U.S. at 439–40. Howard and Macias assert only that they were not free to leave. They identify no facts indicating that the circumstances they faced were more coercive than an ordinary traffic stop; nor do we see any. The traffic stop took place in "public view" on the side of a busy highway. *McCarty*, 468 U.S. at 438. Connors "did not handcuff . . . or physically restrain" Howard and Macias, *United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009), and he

questioned them in a friendly, "conversational" tone, *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017). Only twenty-six minutes passed before Connors read Howard and Macias their rights, and Connors asked no questions during substantial portions of that period. *See United States v. Levenderis*, 806 F.3d 390, 400 (6th Cir. 2015) (characterizing a thirty-minute interview as "relatively brief"). Accordingly, Howard and Macias were not in custody before they were apprised of their *Miranda* rights.

Because Howard and Macias's Fourth Amendment and *Miranda* claims are meritless, the district court did not err in denying their motion to suppress.

## III.

In addition to adopting Howard's suppression arguments, Macias claims that the district court abused its discretion in denying his motion for a new trial because the verdict was contrary to the manifest weight of the evidence. Specifically, he contends that the evidence does not show that there was any agreement between him and Howard to possess the methamphetamines found in the car, because Howard did not have any knowledge of them. Macias first asserted this claim below in support of both his motion for acquittal and his motion for new trial, but he does not challenge the denial of his motion for acquittal on appeal.

Below, Macias's motion for a new trial largely rehashed his suppression claims, but in the final paragraph it also asserted, without argument or further discussion, that the government had "failed to carry the burden of proving the required element of a conspiratorial agreement." R. 67, PageID 1582. The district court ruled that Macias had forfeited any weight-of-the-evidence claim because he had raised it "in a perfunctory manner, unaccompanied by some effort at developed argumentation." 2019 WL 3255164, at *2 (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009)).

"Upon the defendant's motion, the [district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). One ground for granting such a motion is that "the jury's verdict was against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). But the court may vacate a conviction and order a new trial only "[u]pon the defendant's motion." Fed. R. Crim. P. 33(a); *see id.* advisory committee's note to 1966 amendment ("[A] judge has no power to order a new trial on his own motion[;] . . . he can act only in response to a motion timely made by a defendant.").[3] Ordering a new trial *sua sponte* would be reversible error. *See United States v. Smith*, 331 U.S. 469, 473–74 (1947); *United States v. Navarro Viayra*, 365 F.3d 790, 795 (9th Cir. 2004); *United States v. Wright*, 363 F.3d 237, 248 (3d Cir. 2004); *cf. United States v. Davis*, 992 F.2d 635, 639 (6th Cir. 1993) (reversing district court's *sua sponte* order of acquittal issued post-conviction because the provisions of Rule 29(c) "do not differ from those of Rule 33 in any respect sufficient to justify different treatment of these rules").

For the same reason, it would be error for a district court to grant a new trial for reasons not properly presented in the defendant's motion. *See United States v. Nguyen*, 507 F.3d 836, 838–40 (5th Cir. 2007); *Wright*, 363 F.3d at 248; *United States v. Quintanilla*, 193 F.3d 1139, 1148 (10th Cir. 1999); *United States v. Newman*, 456 F.2d 668, 669–72 (3d Cir. 1972). The phrase "[u]pon the defendant's motion" implies not just that the court's grant of a new trial will come after the motion in time but also that it will be related to the content of the motion. *See* Fed. R.

---

[3] Rule 33 by its terms applies after the jury has issued a verdict. Before a verdict is handed down, "trial judges may" by their own motion "declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so." *Renico v. Lett*, 559 U.S. 766, 773–74 (2010) (quoting *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824)). Here the alleged injustice of which Macias complains stems from the jury verdict itself, so the court's power to declare a mistrial before the jury reaches a decision is not implicated.

Crim. P. 33 advisory committee's note to 1966 amendment (Rule 33 "make[s] it clear that a judge . . . can act only *in response to* a motion timely made by a defendant." (emphasis added)).

Because Macias's motion below did not properly present his argument that the jury's verdict was against the manifest weight of the evidence, the district court could not have granted his motion on that basis. *See Nguyen*, 507 F.3d at 839 (reversing district court's grant of a new trial on the basis of an argument that was raised only in a perfunctory way in the defendant's motion below). The district court therefore committed no error in denying Macias's motion for a new trial.

* * *

For the foregoing reasons, we AFFIRM Howard and Macias's convictions.